### COBB et al. v. BROWN et al.

(Circuit Court of Appeals, First Circuit. December 6. 1911.)

No. 927.

1. CARRIERS (§§ 53, 52*)—"BILL OF LADING"—CHARACTER OF INSTRUMENT.

A bill of lading is an instrument of a twofold character, being at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of the property by the carrier, and in the latter it is a contract to safely carry and deliver.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 166, 167; Dec. Dig. §§ 53, 52.*

For other definitions, see Words and Phrases, vol. 1, pp. 790–795.]

2. CARRIERS (§ 173*)—CONTRACT OF CARRIAGE—CONNECTING CARRIERS UNDER THROUGH BILL OF LADING.

A carrier which accepts goods from a connecting carrier with notice that they were shipped under a through bill of lading issued by the initial carrier to the owner assumes contractual relations with the owner, and is bound by the terms of such bill of lading, at least to the extent that they are usual and customary; and it cannot by issuing its own bill of lading to the connecting carrier, containing different terms, impose them on the owner of the goods who has not assented to, and has no knowledge of, such bill of lading.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 760–784; Dec. Dig. § 173.*]

3. CARRIERS (§ 173*)—LIABILITY FOR LOSS OF GOODS—CONTRACT DETERMINING —CARRIAGE UNDER THROUGH BILL OF LADING.

A consignment of wool was shipped from Albuquerque, N. M., to Boston on a through bill of lading issued by the railroad company, which provided that in the event of a loss of goods for which any carrier was liable under such bill the value or cost of the same at the point and time of shipment should govern the settlement, which was a usual and customary provision. It also provided that marine risk was assumed by water carrier. In course of the transportation, the wool was delivered to defendant steamship company and was lost on the voyage to Boston by the sinking of its steamship H. M. Whitney. Defendant issued its own bill to the Southern Pacific Company, from which it received the wool, designating such company as the shipper, but containing the provision: "Deliver to party surrendering bill of lading of initial line properly indorsed." Such bill also provided that goods shipped thereun-

---

der while on board its vessels were covered by marine insurance "in accordance with and subject to the conditions and limitations of policies held by them." Such policies provided that, in case of total loss, the insurer would pay the value of the goods at the point of destination on the date of loss, and defendant collected such amount and paid it to the owner of the wool, but its value at the point and time of shipment considerably exceeded such sum. *Held*, that defendant accepted the wool as a part of a through shipment, and undertook to carry the same on account of the owner and not of the forwarding carrier, and could not, by issuing its bill of lading to such carrier, vary its liability as fixed by the initial bill of lading.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 760–784; Dec. Dig. § 173.*]

Appeal from the Circuit Court of the United States for the District of Maine.

Suit in equity by the Berwind-White Coal Mining Company against the Metropolitan Steamship Company and American Trust Company against the same (consolidated cause). On intervening petition of Jacob F. Brown and others against William T. Cobb and others, receivers for defendant. Decree for interveners, and receivers appeal. Affirmed.

J. Markham Marshall, for appellants.

Hugh W. Ogden (Whipple, Sears & Ogden, on the brief), for appellees.

Before COLT, Circuit Judge, and BROWN and DODGE, District Judges.

BROWN, District Judge. The question in this case arises from a total loss of a shipment of wool by the sinking of the steamship H. M. Whitney of the Metropolitan Steamship Company, November 5, 1908.

The initial bill of lading issued by the Atchison, Topeka & Santa Fé Railroad Company, the first carrier, was a through bill from Albuquerque, New Mexico, to Boston, Mass., and provided:

"In the event of the loss of any property for which any carrier may be responsible under this bill of lading the value or cost of the same at the point and time of shipment is to govern the settlement, unless the valuation is otherwise released or stated on this bill of lading."

The bill of lading also contained the following clause:

"Marine risk assumed by water carrier."

The railroad company delivered the wool to the Morgan Line of the Southern Pacific Company Atlantic Steamship Lines, which transported it to New York, where it was received upon the steamship H. M. Whitney, which sunk while on the voyage to Boston, the point of final destination of the shipment.

The Morgan Line issued its bill of lading, reciting "Shipped by Southern Pacific Co., etc.," with the following indorsements:

"Insured Rate.

"Mdse shipped under this bill of lading is covered by marine insurance while on board the steamers of the Metropolitan Steamship Co. in accordance with and subject to the conditions and limitations of policies held by them.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Deliver to party surrendering bill of lading of initial line properly endorsed."

The policies referred to provided in case of total loss that the insurance company would pay the value of the goods at the point of destination on the date of loss. The value at the point of destination was $2,536.21 less than the value at the point of shipment.

The receivers of the Metropolitan Line collected from its insurers upon the basis of value at the point of destination, and have paid this amount to the consignees, who now claim the difference on the ground that the initial bills of lading were through bills of lading, and imposed upon the Metropolitan Line a contractual liability to settle for the loss upon the basis of the value at point of shipment.

The receivers deny that they entered into any contractual relations whatever with the consignees, either express or implied, unless the contract evidenced by the bill of lading issued by them to the Southern Pacific Company inures to the benefit of the owners of the wool. They contend that the Southern Pacific Company contracted with the Metropolitan Line for transportation on its own account, and not on account of the shippers, and that the Metropolitan Line is not concerned with the contractual relations between the shippers and the preceding carrier.

[1] We think, however, that the appellants place too much reliance upon this bill of lading as evidence that they assumed contractual obligations to the Southern Pacific Company only. A bill of lading is an instrument of a twofold character. It is at once a receipt and a contract. In the former character it is an acknowledgment of the receipt of property on board his vessel by the owner of the vessel; in the latter it is a contract to carry safely and deliver. Pollard v. Vinton, 105 U. S. 7, 26 L. Ed. 998; Iron Mountain Ry. Co. v. Knight, 122 U. S. 87, 7 Sup. Ct. 1132, 30 L. Ed. 1077.

[2] The Metropolitan bill of lading is a receipt issued to the Southern Pacific Company; but from the indorsements it is very clear that it was not dealt with as an owner of goods, and that the bill could not serve in the hands of the Southern Pacific Company or its transferee to represent the goods or the right to receive the property at the place of destination. All this is negatived by the indorsement, "Deliver to the party surrendering bill of lading of initial line," which overrides the printed provision for delivery upon surrender of the later bill of lading. This is a clear acknowledgment that the property right was outstanding in a third person, and was not in the Southern Pacific Company.

The second bill of lading, however, seeks by its terms to impose contractual obligations upon the owners of the goods, and to limit the obligation to them.

The printed form was inappropriate to an independent contract for carriage of the goods on account of the Southern Pacific Company. The Metropolitan Line under this bill acquires no right to collect freight from the Southern Pacific Company, and does not look to its individual responsibility, but seeks to impose its charges upon the

holder of the initial bill and to secure these charges by a lien on the goods.

The printed form makes special exemptions from the ordinary liability of a carrier such as could be valid only with the assent of the owner of the goods. It even provides that the goods shall be subject to a lien, and may also be retained for freight and charges on other goods due from the party "on whose account they are transported."

Clearly it was not intended that these particular goods, deliverable to the holder of the initial bill, should be subject to other charges against the Southern Pacific Company on other goods of other shippers. They are obviously not to be transported on account of the Southern Pacific Company, but on account of a shipper with a proprietary interest. They are to be carried on account of the party who must present the original bill of lading and pay freight charges.

This bill of lading does not on its face purport to be an independent contract of carriage with the Southern Pacific Company if we read beyond the words, "Shipped by Southern Pacific Company." Upon this present record, it is a receipt given to a forwarder with an attempt to impose terms not upon the forwarder, but upon the owner or consignees.

The issuing of the second bill of lading is insufficient to show a refusal to accept goods upon the terms of the original shipment. There is an acceptance of goods with full knowledge that they are in the hands of the forwarders under a through bill of lading, and the issuing of a receipt with provisions inappropriate to a contract with the forwarder, but intended to impose terms upon the owner.

The fact that the Southern Pacific Company is named in the receipt is insufficient in the face of the indorsement as to the initial bill of lading to make the Southern Pacific Company a party to the contract of carriage contained in the rest of the printed form. Neither in the bill nor in the record is there any evidence of authority of the Southern Pacific Company to change the rights of the holder of the original bill of lading.

We are of opinion that the second bill of lading shows an intent to contract with the owner of the goods. As the goods are to be carried at an insured rate, it is a fair inference that the provisions for insurance were intended as a practical compliance with the requirement "Marine risk assumed by the water carrier."

We are of opinion that the goods were tendered by the Southern Pacific Company and accepted by the Metropolitan Line for carriage on account of the owners of the wool. Accepting the goods from the forwarder for carriage on account of the owner, under an outstanding through bill of lading, the Metropolitan Line was legally entitled to claim the benefit of all exemptions on its behalf in the original bill of lading. We think the converse is also true, and that it became bound by such provisions of the original bill for the shipper's benefit as were in accordance with usage, and were reasonably to be expected in an initial bill of lading of ordinary form.

193 F.—61

That the provision for a valuation at the point of shipment was in accordance with usage is established by the evidence.

In fact, the Metropolitan Line's policies by their terms recognize the existence of the usage to insure on this basis of valuation. The insurers were protected against a higher valuation by the express provisions of the policy.

Whether a copy of the initial bill of lading came to the hands of the Metropolitan Line is not stated upon the appellants' brief. From custom the appellee draws the inference that copies of these bills of lading accompanied the wool. Upon the record, therefore, it is not clear whether we are called upon to decide how far mere knowledge of the existence of an initial bill of lading casts upon the connecting carrier a duty to inquire as to its terms, and to what extent in the absence of such inquiry it is bound by the terms of the initial bill.

As we understand the appellants' argument, whether the Metropolitan Line was actually informed of the contents of the initial bill is immaterial to its contention, since it relies upon the giving of the second bill of lading as conclusive evidence that it did not contract with the owner of the wool but with the Southern Pacific Company.

It is not necessary to decide that mere knowledge of the existence of the initial bill bound the connecting carrier to all its terms however extraordinary or unusual. But a carrier who accepts goods from a forwarder, with notice that they are under a through bill of lading issued to the owner at the time of shipment, has such opportunity to obtain actual knowledge of the terms of the original bill that there can be no injustice, as between it and the holder of the original bill, in charging it with knowledge of those terms—to the extent at least of implying from its acceptance of the goods its assent to such terms of the original bill as are not unreasonable and conform to established usage. The carrier, under such circumstances, cannot be heard to contend that, unless actual knowledge is affirmatively shown, no assent on its part is proved.

[3] We are of the opinion that the Metropolitan Line, upon the evidence in the record, accepted the goods as a part of a through shipment, and undertook to transport them on account of the owner and not on account of the forwarder. Under these circumstances, it could not, by any act of its own, impose terms upon the owner without his consent, nor could the forwarder consent for want of authority.

The discrepancy between the valuation in the initial bill and that in the Metropolitan policies referred to in the second bill affords slight evidence of any actual intention of the agents of the Metropolitan Line to refuse to accept the goods for carriage on account of the owners on the original terms, or to impose upon the owner terms at variance with those of his original contract. Valuation at the point of destination might be larger or smaller than at the point of shipment, according to the wool market. Either valuation is fair and reasonable enough, and this case involves not a question of actual intent, but merely an inquiry into the rights of the parties under circumstances not foreseen, but presumably entirely accidental so far as any disparity between the initial bill of lading and the Metropolitan's policies is concerned.

As the valuation in the initial bill is reasonable and in accordance with the usage of the trade, as the goods were accepted for carriage on behalf of the owner at an insured rate, we are of the opinion that the Metropolitan Line agreed in substance to assume the marine risk, and that the extent of its obligation to the holder of the initial bill upon its assumption of marine risk is to be measured by the reasonable terms of the initial bill of lading—terms which in ordinary course of trade would appear on the documents attending the transportation of the goods—rather than by the indirect references to the unknown terms of its own insurance policies contained in its receipt to the forwarder.

It is inconsistent with the usage in this trade that the shipper's rights should be varied without his knowledge.

Without questioning the connecting carrier's right to refuse goods upon the terms of the initial bill of lading, we find no evidence of any actual intent to refuse the offer made by the through bill of lading. The goods were accepted, and any attempt to vary the initial shipper's rights by handing to the forwarder a printed blank with the provisions in question was ineffectual.

The decree of the Circuit Court is affirmed, and the appellees recover costs in this court.