## GALVESTON WHARF CO. v. AMERICAN GROCERY CO. et al. (No. 2117.)

Court of Civil Appeals of Texas. El Paso. Jan. 17, 1929.

Rehearing Denied Feb. 14, 1929.

Thompson, Knight, Baker & Harris, of Dallas, for Galveston Wharf Co.

Fryer & Cunningham, of El Paso, for American Grocery Co.

Baker, Botts, Parker & Garwood, of Houston, and Kemp & Nagle, of El Paso, for Galveston, H. & S. A. Ry. Co.

Turney, Burges, Culwell & Pollard, all of El Paso, for Mallory S. S. Co.

WALTHALL, J. This suit was brought by the American Grocery Company, a corporation, and other plaintiffs, against the Mallory Steamship Company, hereinafter referred to as Steamship Company, the Galveston, Harrisburg & San Antonio Railway Company, hereinafter referred to as Railway Company, and the Galveston Wharf Company, hereinafter referred to as Wharf Company, to recover the value of a quantity of sardines destroyed by fire on the destruction by fire of the pier at Galveston, Tex., on which the shipment of the sardines had been placed.

The trial court made and filed findings of fact, which we adopt, except as some sections of the findings may be modified or changed

on consideration under the proposition or propositions referring thereto. The findings state by numbered paragraphs very minutely the facts upon which the several parties joined issue, and will be helpful by reference thereto, without a further statement of the pleadings or the facts proved.

## "Findings of Fact.

"I. I find that on or about December 23, 1925, the Maine Co-operative Sardine Company delivered to the Seaport Navigation Company, a common carrier, at Eastport, Maine, 1,105 cases of Oil Keyless sardines and 20 cases Key Dec sardines, for which a through bill of lading was issued, shipper's order, notify American Grocery Company, El Paso, Texas. That said merchandise was routed Seaport Navigation Company, Mallory Steamship Company, and Southern Pacific Lines. That said shipment was by the Navigation Company delivered to the Mallory Steamship Company at New York City about the 6th of January, 1926. That same was transported by the Mallory Steamship Company on their steamship Concho to Galveston, Texas, where it arrived about 7 a. m., January 13, 1926.

"II. That said Mallory Steamship Company began unloading the freights from said vessel at about 8:30 a. m. January 13, 1926, onto the wharves which had been set aside and provided for that purpose, and that the entire cargo of said vessel had been entirely unloaded and placed on the wharf prior to 5:30 p. m. of said date.

"III. That the shipment of sardines above referred to had been unloaded by the Mallory Steamship Company and had been by said company put at the designated place on the wharf, and was in proper condition for further transportation to point of destination at and before 4 p. m. of said date.

"IV. That the wharf at which the steamship Concho docked, and at which the cargo thereof was unloaded, including the shipment above referred to, was owned by the defendant Galveston Wharf Company, but the defendant Mallory Steamship Company and the defendant Galveston Wharf Company, under date of July 1, 1914, entered into a written agreement under which, for the consideration of $5,000 per year, payable in monthly equal installments, and for a period of five years, ending on the 30th day of June, 1919, the Wharf Company agreed to permit and allow the Mallory Steamship Company and its affiliated lines to berth its and their vessels alongside, among others, the pier 24 at which the cargo above referred to was unloaded.

"Paragraph B of article III of said contract reads as follows: 'It is distinctly agreed and understood that the payment of the said sum of five thousand and no/100 dollars ($5,-000.00) per annum hereinabove provided for is to be made as shed hire, and in addition thereto the Wharf Company shall be entitled to collect from the Steamship Company, and the Steamship Company will promptly pay to the Wharf Company, the regular wharfage and other rates and charges specified in the tariffs published or hereafter to be published by the Wharf Company for all goods, commodities, wares, and freight loaded into or out of vessels of the Steamship Company, or its affiliated lines, which shall berth at said piers, and will comply with all rules shown in such tariffs.'

"And article VI of said contract reads as follows: 'It is agreed that the Wharf Company shall in no way be responsible for any loss or damage to any goods or cargoes handled over and through said wharves, sheds and warehouses, unless same be caused by defects in roof of warehouses; and that should the Steamship Company allow any of said wharves to be overloaded at any time so as to cause damage thereto, or to said sheds, the Steamship Company will pay all damages caused thereby and the cost of repairing such wharf or shed.'

"Article XIV thereof reads as follows: 'After the expiration of the said five-year period, this contract shall continue in effect, according to the terms and conditions herein specified as long as the business of the Steamship Company, or its affiliated lines at the port of Galveston justifies the same and when such business fails to justify the same, this contract may be terminated by either party by giving to the other party Sixty (60) days written notice of its intention so to terminate it.'

"That, since the execution of said agreement, the Steamship Company has been using, among others, the said pier for the purposes and as provided in the above mentioned contract.

"V. That the Galveston Wharf Company is a chartered transportation company, owning, in addition to the piers located on the Galveston Bay side of the island, about fifty-one (51) miles of railroad trackage, extending from said piers along and through its yards in Galveston to connections with the lines of railroad operating out of Galveston, including the Galveston, Harrisburg & San Antonio Railway Company. That said Galveston Wharf Company owns and operates eight (8) switch engines, providing therefor the necessary yard and engine forces.

"That it had on file with the Interstate Commerce Commission, and with the Texas Railroad Commission, duly promulgated tariffs covering its charges for the various services performed and to be performed by it. That it makes the regular reports to the Interstate Commerce Commission that are ordinarily made and required of all common carriers by railroad. That it has a general manager, superintendent of terminals, treasurer and the usual other officers as required and

necessary in the conduct of that character of business. That its railroad tracks extend to and along the pier 24, where the shipment in question had been unloaded from the steamship.

"That at the time the steamer Concho departed from New York on the voyage in question there was, by said company, sent by United States mail to its office at Galveston complete billing of all the shipments on board said vessel. Said billing contained, among others, point of origin of the shipment, name of the shipper, destination, and name of the consignee and the routing thereof over railway lines out of Galveston. That this billing was received by the Mallory Steamship Company at Galveston about two or three days prior to the arrival of the vessel, and after a record thereof was made in its wharf office, all of said billing was immediately, and two days prior to the arrival of the vessel, delivered to the defendant Galveston Wharf Company for information and instruction as to the handling of each and all of the shipments contained in said vessel after same had been placed on the wharf by the Steamship Company, and that the defendant Galveston Wharf Company, after making a record of the contents of said billing, delivered same to the respective carrier which was to handle the respective shipments out of and beyond Galveston, and that the billing covering the shipment of sardines in question had been delivered by the Mallory Steamship Company to the Galveston Wharf Company two days prior to the arrival of said vessel, and said Galveston Wharf Company had delivered the same to the defendant Galveston, Harrisburg & San Antonio Railway Company, which was the railway that was to carry said shipment of sardines from Galveston to El Paso.

"That prior to the arrival of said steamship Concho at Galveston both the defendants, Galveston Wharf Company and Galveston, Harrisburg & San Antonio Railway Company, knew that said shipment of sardines was in said ship and how same was to be routed out of Galveston to destination. That the forwarding of said billing from New York, and the method of handling same as above detailed, was the same method that had been used customarily between the various carriers involved for many years, and there was 'no difference in the method of handling the cargo involved than the method that had been in use for many years, and that, as was usual and customary under such circumstances, the Galveston Wharf Company, through its superintendent of terminals, made requisition on the various railroads for the necessary cars to handle the shipments to be moved by them respectively out of Galveston, and that following this custom there had been delivered by the railroads operating out of Galveston to the Galveston Wharf Company seventy-six (76) cars, which cars were sent to the wharf on the night of January 12 by the Wharf Company for the purpose of loading therein the various shipments routed over the respective railroads, and which were to be delivered from the steamship Concho, and that said cars were ready and at hand, including a car for the carriage of the shipment of sardines in question.

"VII. That the vessel Concho was unloaded by a force of men provided and paid for by the Mallory Steamship Company, and as each particular shipment was unloaded it was placed, or spotted, in that territory on the wharf which had been usually and customarily set aside for that purpose—that is to say, the car load freight destined for transit out of Galveston over the Galveston, Harrisburg & San Antonio Railway Company was usually and customarily placed by the Mallory Steamship Company in that territory on the wharf that had been generally designated by the Wharf Company for that purpose, and so on for the other railroads having freights for carriage on said vessel, and that the carload of sardines in question was by the Mallory Steamship Company duly placed in the territory so set aside for the reception and delivery of such freights which were to be carried out of Galveston by the Galveston, Harrisburg & San Antonio Railway Company, and that all the work to be done relative thereto by the Mallory Steamship Company had been fully completed and performed by 4 o'clock on the afternoon of January 13, 1926, and that thereafter, and having so made such placement, the Mallory Steamship Company had nothing whatever to do with the further handling or movement of said shipment.

"VIII. That the defendant Galveston Wharf Company had a force of men at work on the wharf, whose duty it was to carry and handle the shipments unloaded from the steamer from the point where same had been placed on the wharf by the Mallory Steamship Company into the cars, and that such handling by the employees of the Galveston Wharf Company was wholly independent of any prior handling by the employees of the Mallory Steamship Company, and same was done as a matter of course, without any character of direction or advice from the Mallory Steamship Company or any of its officers or employees. That the entire physical handling of each and all of said shipments, including the one in question, from the place where located on the wharves by the Mallory Steamship Company, was under the entire direction and control of the Galveston Wharf Company, and that the shipments of sardines in question could have been loaded on the car by the Galveston Wharf Company, and by it moved from the wharf, at any time after 4:00 o'clock on the afternoon of January 13, 1926, and that the time when said shipment was to be loaded on to the car was entirely left to

the judgment of the Galveston Wharf Company, and with which the Mallory Steamship Company had nothing to do. That the defendant Galveston Wharf Company exercised its own judgment and discretion as to when and how it would do the loading onto the cars, and during the day of January 13, 1926, the Galveston Wharf Company actually loaded out some forty-five (45) cars of the freights which had been unloaded from the Concho, all of which was done as best suited its convenience, and for which service it was paid the usual tariff rates by the railroad handling the respective shipments out of Galveston to destination.

"IX. That the forces of the Galveston Wharf Company which were engaged in loading freights which had arrived on the steamer Concho quit work at 7 p. m. on January 13, and that had they continued to work after that hour the Galveston Wharf Company would have been required to pay them overtime for the service, and that at the time said forces so quit work the freights that had not been loaded into cars were left on the wharf at the designated place, where they had been placed by the Mallory Steamship Company, and that had the forces of the Galveston Wharf Company continued the work of loading until 8:45 or 9 o'clock that night, all of the cargo could have been and would have been loaded on cars.

X. That the car of sardines in question was not loaded out, and same was left by the Galveston Wharf Company on the wharf at the point where it had been placed by the Mallory Steamship Company, and that all of said shipment was destroyed by a fire which broke out at about 1 a. m. on the morning of January 14.

"XI. That it was usual and customary for the Galveston Wharf Company to give to the Mallory Steamship Company receipts for goods and shipments after same had been delivered by the Steamship Company to the Wharf Company. However, the Steamship Company never required the Wharf Company to deliver a receipt or receipts before freights and shipments were removed from the wharf, and in fact no receipt was ever issued and delivered to the Steamship Company by the Wharf Company for freights received until two or more days had usually passed after the shipments and freights had moved out of Galveston. The delivery of receipts for goods and shipments was not a prerequisite required by the Mallory Line before same could be moved from the wharf, and sometimes as much as a week passed after freights had been moved from the wharf by the Galveston Wharf Company before receipt therefor was delivered by the Wharf Company to the Steamship Company.

"The purpose of receipts was that the Mallory Line might have permanent record thereof for future use, and a receipt when so given, and while signed by the Galveston Wharf Company, was really for account of the railroad transporting the particular freight out of Galveston. No receipt for the shipment of sardines in question was delivered to the Mallory Steamship Company by the Galveston Wharf Company.

"XII. That had said shipment of sardines been moved promptly out of Galveston, same would have reached El Paso about the 18th day of January 1926, and the market value thereof at El Paso, on January 18, 1926, was $5,376.25, and that said shipment, while consigned to the American Grocery Company at El Paso, Texas, was really purchased and would have been delivered in El Paso in agreed proportions to American Grocery Company, Charles L. Pomeroy Company, the H. Lesinsky Company, F. S. Ainsa Company, Joseph Renin, doing business under the name of Western Grocery Company, Adolph Nasits, doing business as Nasits Sales Company, Max Franklin and Harry Goodman, doing business under the name of Franklin & Goodman, and C. H. Lawrence. That said plaintiffs, and none of them, ever received any of said goods, nor have they, or either of them, ever been paid the value thereof."

From the findings made the trial court concluded as a fact and a matter of law that the Steamship Company had made due delivery of the shipment in question by the placement thereof on the wharf of the Wharf Company, at the point designated for its receipt, and that at the time of its destruction by fire the shipment had been received by and was in the possession of the Wharf Company as a common carrier. The trial court further concluded that the Steamship Company delivered the shipment in due course of transit; that the handling of the shipment by the Wharf Company was an integral part of the transportation between the point of origin and its final destination; that the Wharf Company intended to deliver the shipment to the Railway Company, for transit to its final destination, but that delivery by the Wharf Company to the Railway Company had not been made at the time of its destruction by fire. The trial court further concluded that article 6 of the contract between the Wharf Company and the Steamship Company, as set out in the fourth finding of fact, was not a contract of indemnity to the Wharf Company by the Steamship Company, and that thereunder the Steamship Company did not assume responsibility for the loss of the goods at the time of the loss in the possession of the Wharf Company. The trial court further concluded that if article 6, referred to, may be construed as such indemnity to the Wharf Company, then and in that event it was contrary to public policy, and for that reason void, in that it undertakes to exonerate the Wharf Company from loss by reason of its negligence as a

common carrier, and that there is no lawful authority for the Steamship Company, a transportation company subject to the acts of Congress, to become guarantor or surety of another transportation company in the performance of a duty owed by the latter to a shipper. The trial court concluded, under the facts found, that the Wharf Company was liable to plaintiffs for the loss sustained, the amount as in the paragraph 12 of the findings, and that the Wharf Company was not entitled to recover over and against the Steamship Company or the Railway Company, the possession at the time of the loss not being with either, the shipment being interstate and the carriers each being subject to the provisions of the Interstate Commerce Act, and the trial court so entered judgment.

### Opinion.

The Wharf Company and the plaintiffs in the suit both appeal by writs of error, the latter doing so for the purpose of preserving its rights against the Steamship Company and Railway Company, in the event the judgment in its favor against the Wharf Company be reversed. It is quite evident that the plaintiffs in the suit are entitled to judgment against some one of the defendants, and for the amount rendered, and the purpose of the suit is to fix the liability where, under the law and the facts, the liability properly rests. Judgment was rendered against the Wharf Company, and the case is before us for review as to its liability.

The several propositions present three questions, two of law and one of fact. As briefly as we may state the facts, from the findings of the trial court, without quoting at too great length therefrom, the Wharf Company is a chartered transportation company, owning the piers located on the Galveston Bay side of the island, and about 51 miles of railroad trackage, extending from said piers along and through its yards in Galveston to connections with the Galveston, Harrisburg & San Antonio Railway Company, one of the connecting carriers and the delivering carrier in this shipment; its railroad tracks extending to and along the pier 24, where the shipment in question had been unloaded from the Steamship Company onto that pier. The Wharf Company also owns and operates eight switch engines, providing therefor the necessary yard and engine forces. At the time involved here it had on file with the Interstate Commerce Commission, and with the Texas Railroad Commission, duly promulgated tariffs covering its charges for the various services performed and to be performed by it. It has a general manager, superintendent of terminals, treasurer, and the usual other officers as required and necessary in the conduct of that character of business. It makes the regular reports to the Interstate Commerce Commission that are ordinarily made and required of all common carriers by railroad.

The services the Wharf Company performs are substantially the following: It maintains a force of men at work on the wharf, whose duty it is, by means of the facilities provided by the Wharf Company, to pick up, carry, and handle the shipments unloaded from the steamship from the point where the same had been placed on the wharf by the Steamship Company into the cars; such picking up, carrying, and handling being wholly independent of any prior handling by the employees of the Steamship Company, and done as a matter of course, without any character of advice or direction from the Steamship Company or its employers, the time when and how the shipment was to be loaded on the cars, after the shipment was in its possession or under its control, being left entirely to the judgment of the Wharf Company. Two services of the Wharf Company are mentioned, one designated as a "loading service," the service by which it would pick up and load a shipment into the cars of a railroad to be transported to a point on its line, and for which service the tariffs provided a charge, which would be paid by the Railroad Company over whose line the particular shipment was to be made. When a shipment had been loaded by the Wharf Company into the cars of a railroad company the Wharf Company would then, as a part of its service, switch the loaded car from the point where loaded on its track, adjacent to the docks, to the connecting tracks of the railroad line which was to carry the shipment to the interior point. This last service was known as a "switching service," and that service was paid for by the railroad company over whose line shipment was to be made to interior points.

■ Before considering the legal questions involved, we think it well to determine the the issue of fact as to the possession of the shipment of sardines at the time of their loss by fire. The trial court concluded from the facts found that, not only as a fact, but also as a matter of law, the Steamship Company having made delivery of the shipment of sardines by its placement on the wharf of the Wharf Company at the point designated for its receipt, the shipment at the time of its destruction by fire was in the possession of the Wharf Company as a common carrier. The trial court's finding as to its possession is challenged by the Wharf Company on the ground that there is no evidence that the place where the sardines were placed on the wharf was designated by it. The Railroad Company also challenges that finding. It is not questioned but that the waybills covering this shipment were received by the Wharf Company some two days before its arrival at Galveston, the waybills disclosing the storage indicating the part of the ship where the

shipment was stowed, the consignor, consignee, routing out of Galveston, and its destination, and were distributed through the Wharf Company to the Railway Company. In other words, both the Wharf Company and the Railway Company knew that on the Steamship Company's ship Concho this particular shipment would arrive at that wharf and pier, and was to be picked up and loaded on the cars of the Railway Company by the Wharf Company and carried to its destination by the Railway Company. It is also unquestioned that the billing for this shipment had been duly written up in the records of both companies, and cars of the Railway Company set to this particular wharf into which the shipment was to be loaded. There is no question but that the ship Concho, carrying this shipment, was docked at Galveston at about 8:15 a. m. January 13, 1926, and berthed at the Wharf Company's piers Nos. 24 and 25.

Without quoting the evidence, it shows that the unloading of the ship was commenced at 8:30 a. m. on the day of its arrival and was completed on that day at about 5:30 p. m. The evidence shows that this particular shipment was unloaded and placed on the wharf about 3 p. m. of that day.

F. E. Bertram, dock superintendent of the Mallory Steamship Company, testified: "As to who designates the place on carload shipments (the shipment here was such), it is understood and agreed that they be discharged opposite the part of the ship where they are stowed. A shipment stowed in the forward end of the ship is discharged opposite the forward end, and shipments in the aft end are discharged opposite the aft end. * * * This shipment was in the forward end, and it was discharged in that territory that was adjacent to the forward end of the vessel. It was discharged adjacent to the railroad tracks. * * * Cars were placed for this shipment the night before the arrival of the vessel, * * * and these tracks are adjacent to the place where the freight of the forward end of the boat is unloaded. It is about 70 or 80 feet, probably, from the point on the wharf where we place the goods to the adjacent railroad tracks. When the goods are discharged on the wharf by the Mallory Line, the Galveston Wharf Company handles it from that point. * * * The Galveston Wharf Company was actually loading cars there that day. * * * They quit in the afternoon, according to my recollection, about 6:30 p. m. January 13th. The fire occurred that night. * * * Our force unloaded the vessel and put the shipment at convenient places on the wharves as designated. * * * Relative to the time when we have placed our shipment at the designated places on the wharves, * * * the Wharf Company may load out immediately. * * * The billing was already in the hands of the Wharf Company. * * * We do not require the Galveston Wharf Company or the connecting railroad to give us a receipt before we permit them to move the shipment from the point we put it on the wharf. They just take it. * * * These shipments could have been loaded before 9 that night. * * * It is a fact that, on this particular day this Concho ship unloaded, a large number of cars had been loaded by the Galveston Wharf Company. In every one of those instances they picked up the freight from where the Mallory Line had deposited it on its pier No. 24, and took it to the cars, and we later got a receipt."

The witness testified that some recoopering was necessary, and that such had been done by 5:30; at that time all of this shipment was conditioned to go forward.

Albert J. Schulte, chief dock clerk of the Mallory Steamship Company, testified that this particular shipment was carried to and placed on the designated place on the dock; that the broken packages were all recoopered and the packages O. K.'d and so marked, and the carload of sardines was ready to be put on the cars by 4.

E. E. Grossrean, general manager of the Wharf Company, testified that the Wharf Company leased pier Nos. 23, 24, and others to the Mallory Line by written contract, and that at the time involved here the lease was in force; that the shipment in question was unloaded from that pier, and from that pier the Wharf Company, on that day picked up and loaded on cars 45 of checked freight and 16 straight carloads out of the cargo of the ship Concho. He further testified that "this cargo could have been loaded that night"; that the record indicated that the last labor forces knocked off approximately at 7.

The evidence, we think, sustains the trial court's finding that the place on the wharf where the sardines were placed was the proper place to unload them, and that the place had been designated by the Wharf Company as the place for unloading them.

The evidence shows that, after the shipment had been unloaded and placed on the wharf at that place, the Steamship Company's service was ended, and that it was then in the line of service of the Wharf Company to pick up the sardines and put them on the cars of the Railway Company then waiting to receive them, some 70 or 80 feet away. As we view it, delivery of the shipment was complete, the Wharf Company having been put in absolute and unconditional control of the shipment; in other words, an actual change of possession from the Steamship Company to that of the Wharf Company had occurred, nothing else remaining to be done, the broken packages having been recoopered and O. K.'d, the whole shipment was then in a deliverable state at that time and place.

The above, as to delivery of possession of the shipment, seems to be sustained by both state and federal courts, under the facts of this case, whether the Wharf Company was acting for itself or as agent for the delivering carrier. 3 Encyclopedic Digest of Texas Reports, Civil Cases (Michie) p. 286; 10 Cyc. p. 221 et seq.

■ The remaining and more difficult question to be determined is the legal liability of the Wharf Company for the loss. The Wharf Company submits that, it not being a party to the bill of lading, and its service being performed on behalf of the connecting or delivering carrier in loading the shipment on the cars of such carrier, it is not a connecting carrier, but only the agent of the carrier for whom it renders such service, and therefore not liable to the shipper for loss of the shipment by fire, though it had constructive possession of such shipment.

The trial court found that the Wharf Company is a chartered transportation company, owning the piers located on the Galveston Bay side of the island, about 51 miles of railroad trackage, extending from the piers, along and through its yards in Galveston, to connections with the lines of railroad operating out of Galveston, including the Galveston, Harrisburg & San Antonio Railway Company, and that it owns and operates eight switch engines, with necessary yard and engine forces. It seems to us that under the above finding of the trial court, and the duties and services of the Wharf Company elsewhere stated, the Wharf Company would be a private corporation, under subdivision 72 of article 1302, created for the purpose of the construction, operation, and maintenance of terminal railways. Article 6549 of our Statutes provides that "terminal railways shall have all the rights and powers conferred by law upon railroads by chapters 6 and 7 of this title," and states certain other matters pertaining to such corporations; but the statute nowhere states its duties, nor services to be rendered, nor its liabilities as in that of railroads or carriers; nor does the statute, as we view it, prescribe the duties and liabilities of terminal companies in this state, nor that the remedies against them shall be the same as are prescribed by the common law.

In Texas & Pacific Ry. Co. v. Henson, 103 Tex. 598, 132 S. W. 118, the Fort Worth Belt Railway Company was impleaded in the suit by the Texas & Pacific Railway Company. The Belt Railway Company owned several miles of railroad track and engines, and its business was to intercept and transport cattle trains on their way to the stockyards at Fort Worth, and transport them over its own line to the stockyards. The services of the Belt Railway Company to the Texas & Pacific Railway Company were similar to those of the Wharf Company in the instant case. In that case the Supreme Court held that the Belt Railway Company was a transportation company, and not a railroad company or a common carrier, within the meaning of the statute quoted. We have not found that case discussed or in any way modified by the Supreme Court. Our courts have uniformly held that terminal companies, belt line companies, and railroad companies performing a transfer, shifting, or switching service, in the performance of such service are acting in the capacity as the transfer agent of the company for which the service is performed, and not in the capacity of a carrier or railroad company. Texas & Pacific Railway Co. v. Scoggin & Brown, 40 Tex. Civ. App. 526, 90 S. W. 521, by Judge Speer, for the Fort Worth Court; St. Louis Southwestern R. Co. of Texas v. A. A. Jackson & Co., 55 Tex. Civ. App. 407, 118 S. W. 853, by Judge Bookhout, for the Dallas Court; Chicago, R. I. & G. R. Co. v. Young & Ball (Tex. Civ. App.) 107 S. W. 127, by Judge Levy, for the Texarkana Court; Rio Grande Ry. Co. v. Kraft & Madero (Tex. Civ. App.) 212 S. W. 981, by Judge Higgins, for the El Paso Court; Lancaster v. Hollebeke (Tex. Civ. App.) 235 S. W. 1115, by Judge Higgins, for the El Paso Court; and many others to which we might refer:

■■ If the Wharf Company was serving in the capacity of transfer agent of the Railway Company, the principal and connecting and delivering carrier, it follows that the delivery of the shipment to the Wharf Company was delivery to the Railway Company, the principal. But it would be immaterial as to the capacity in which the Wharf Company represented the Railway Company, if it is likewise liable with the principal to the shipper of the sardines under the facts of the case. The rule as to the liability of an agent to a third party with whom there is no privity has been stated in different ways.

One text-writer tersely states it thus: "The rule is that an agent is personally liable to third persons for doing something which he ought not to have done, but not for not doing something which he ought to have done." Ewell's Evans on Agency, 329, 334. Story on Agency, 309, and 3 Shearman & Redfield on Negligence, announce the same rule.

In Labadie v. Hawley, 61 Tex. 177, 48 Am. Rep. 278, after stating the above rule and referring, with approval, to a number of cases in which the rule is recognized, Judge Stayton refers with approval to a case which states the rule thus: "The agent is also personally liable to third persons for his own misfeasances and positive wrongs. But he is not, in general, liable to third persons for his own nonfeasances or omissions of duty in the course of his employment. His liability in these latter cases is solely to his principal, there being no privity between them and such third persons; the privity exists only between him and his principal."

In Eastin & Knox v. Texas & Pacific Rail-

**990**

way Company, 99 Tex. 654, 92 S. W. 838, in a suit for damages in a cattle shipment case, where the agent of the railway company refused to route the shipment as requested by the shipper from a point in Texas to their point of destination in Oklahoma, and damages resulted by reason of the longer haul, the agent was joined as defendant. In discussing the question of the liability of the agent Judge Gaines said: "Where the agent is empowered to perform a duty for his principal and neglects to perform it, and damage accrues from the failure, the agent is not responsible, though the principal may be." In that case the agent was held liable with the principal, because, as said in the opinion, the wrongful act that caused the damage was done by the agent in the prosecution of the principal's business. In other words, the agent did something he ought not to have done, an overt act, a positive wrong, rather than an omission of some service he should have performed in the course of his employment.

To apply the above rule to the facts of the instant case, if, as the trial court found, and as we believe, the Steamship Company had delivered the shipment to the Wharf Company, and the Wharf Company should have picked up the shipment of sardines and put them in the waiting cars of the Railway Company and failed to do so, such failure was an act of omission, and not of commission of a positive wrongful act, and, under the rule as above, would not be liable to the shipper.

We have not discussed, nor tried to distinguish, a number of cases to which we have been referred. To do so would extend the opinion beyond a reasonable length. The cases referred to in the opinion, we think, sustain the conclusions we have reached. For reasons stated, the case is reversed as to the Wharf Company, and, the facts having been fully developed, judgment is here entered in favor of the plaintiffs below, American Grocery Company and others, whose names appear elsewhere, against the Galveston, Harrisburg & San Antonio Railway Company, for the amount found by the trial court to be the damages sustained.

The railway company filed a cross-action against the Steamship Company and the Wharf Company, asking judgment over against said companies in the event the plaintiffs in the suit recovered against it. We are therefore now called upon to consider the disposition which should be made of such cross-action.

From what has already been said, it is obvious no liability over exists in favor of the Railway Company against the Wharf Company. The ground of liability asserted in the cross-action against the Wharf Company is that the fire which destroyed the sardines was caused by the negligence of the Wharf Company.

It is stated in the printed argument of the Wharf Company as follows: "The fire which damaged this property was not due to the negligence of any of the parties involved, as the record shows that any claim of negligence was withdrawn at the trial of the case." And in the brief of the original plaintiffs it is stated: "In the trial of the cause all parties waived any claim of negligence on the part of any one of the defendants."

We have searched the record, and find nothing of record to substantiate these statements; but the correctness thereof is not questioned by the other defendants in error. In any event, no evidence was offered in support of the allegation of negligence in the cross-action. Hence the cross-action fails for want of any evidence to support the same. Therefore judgment must also be rendered against the Railway Company upon said cross-action.

Reversed and rendered, to conform to the rulings herein made.