GALVESTON WHARF CO. ET AL. *v.* GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY CO. ET AL.

No. 411.   Argued January 22, 25, 1932.—Decided March 14, 1932.

128

*Mr. George S. Wright,* with whom *Messrs. Alex F. Weisberg* and *Rhodes S. Baker* were on the brief, for petitioners.

*Mr. John P. Bullington* for the Galveston, Harrisburg & San Antonio Ry. Co., respondent.

*Mr. Roscoe H. Hupper,* with whom *Mr. Burton H. White* was on the brief, for the Mallory Steamship Co., respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The American Grocery Company and others brought this action against the Mallory Steamship Company, the Galveston Wharf Company, and the Galveston, Harrisburg & San Antonio Railway Company to recover the value of a carload of sardines destroyed by fire at Galveston, Texas, while en route to El Paso in that State. The goods had been shipped from Maine to El Paso on a through bill of lading issued by the Seaport Navigation Company and describing the route as " Mallory, Southern Pacific." The Mallory Steamship Company had transported the goods from New York to Galveston, and at the time of the fire the goods were on the pier which that company had leased from the Galveston Wharf Company. The latter company, a chartered transportation company not named in the bill of lading, owned, in addition to certain piers, railroad trackage from these piers to connections with railroads running out of Galveston, including that of the Galveston, Harrisburg & San Antonio Railway Company, that being the Southern Pacific line described in the bill of lading as the delivering carrier. There was no attempt to prove negligence on the part of any of the defendants. The District Court, a jury being waived, held that the goods had been delivered by the Mallory Steamship Company to

the Galveston Wharf Company, that the latter was in possession of the goods as a common carrier, and that at the time of the loss they had not been delivered to the Galveston, Harrisburg & San Antonio Railway Company. The judgment, entered in the District Court against the Wharf Company, was reversed by the Court of Civil Appeals which directed judgment against the Railway Company upon the ground that the Wharf Company was acting as a transfer agent for the Railway Company and was not liable for the loss. 13 S. W. (2d) 983. The Supreme Court of the State reversed the judgment of the Court of Civil Appeals and affirmed that of the District Court. 25 S. W. (2d) 588, 36 S. W. (2d) 985. This Court granted a writ of certiorari.

The Wharf Company, petitioner, in the view that the question of the liability of carriers under an interstate bill of lading is governed by the Federal decisions,[1] contends that the state court erred in holding (1) that the possession of the shipment at the time of the fire had passed from the Steamship Company to the Wharf Company, (2) that the Wharf Company had possession as a connecting carrier and not as agent of the railroad carrier named in the bill of lading, and (3) that the Wharf Company was liable as insurer of the shipment when its filed tariff provided that it should not be liable save for its negligence. The American Grocery Company, plaintiff in the action (which joined in the Wharf Company's petition for certiorari) contends that it is entitled to recover "from some one of the three defendants in the trial court" and that it is the Steamship Company which should be held liable. The Railway Company, respondent, also urges that there had been no delivery of the goods by the Steamship Company, and further that, if

---

[1] *Southern Ry. Co.* v. *Prescott*, 240 U. S. 632, 636; *Georgia, Florida & Alabama Ry. Co.* v. *Blish Milling Co.*, 241 U. S. 190, 194, 195; *Missouri Pacific R. Co.* v. *Reynolds-Davis Grocery Co.*, 268 U. S. 366.

such delivery had been made, the Wharf Company held the goods as common carrier and not as the Railway Company's agent, and that the tariff of the Wharf Company was inapplicable.

*First* The Court of Civil Appeals, while reversing the judgment of the District Court, did not disturb the finding that the Steamship Company had delivered the goods to the Wharf Company, but on the contrary reaffirmed it. The Supreme Court held that this finding was supported by evidence and reached its conclusion upon that basis. The petitioners insist that the three courts were in error and that the finding is opposed to the undisputed evidence. We are unable to agree with this contention. The tracks of the Wharf Company were on the pier and there the Steamship Company and the Wharf Company had adjoining offices. The Wharf Company had its own force of men on the pier to handle the shipments for rail transportation. It was the practice to have cars spotted conveniently to receive the shipments according to the routing. The Steamship Company placed the goods on the pier in convenient locations where the Wharf Company, which according to custom had already received the billing and had full information of the shipments, could load them into the waiting cars.[2]  In the instant

---

[2] The testimony of the General Manager of the Wharf Company contains the following:

"It is our privilege to begin loading as soon as it is put on the wharf, unless a hold order is put on some specific shipment, which happens only occasionally. So that as soon as freights were deposited on the wharf by the forces of the Mallory, there was nothing to prevent our forces from immediately picking it up and trucking it to the cars. That was all left to the judgment and discretion of the Galveston Wharf Company's supervisor of forces on the docks. It was not a matter within the control of the Mallory Line. . . . As the freights were placed on the wharf by the Mallory Line, it was purely a matter of the Wharf Company to determine just how and when to load the particular shipment in the usual manner. . . . It is the Mallory Line's usual performance to deposit it on the floor, and it is picked up and loaded into the cars by the Gal-

case, it appeared that the ship had arrived early in the morning (January 13, 1926) and had been fully discharged by five-thirty o'clock in the afternoon; that, as the goods were unloaded, they were put in the usual manner in suitable locations for the picking up and loading into cars by the Wharf Company; that out of 1081 tons so discharged on that day and put in the designated places, the Wharf Company had actually loaded into cars all but 379 tons, and that carloads similarly routed, and placed in approximately the same location as the shipment here involved, had been so loaded. There was evidence that the latter shipment had been suitably placed on the wharf before four o'clock in the afternoon, and was ready by that time for loading by the Wharf Company and completely at its disposal,[3] but the Wharf Com-

veston Wharf Company. As to the particular time it is picked up, that is wholly in control of the Wharf Company. After it had been placed, and it was O. K.'d to go, we were at liberty to pick it up and send it forward at any time we got ready, and it was not necessary for us to ask permission of the Mallory Line about it. Unless there is some special feature connected with it, as a hold order, the usual course is to load it and get rid of it. So far as the actual physical handling of the shipment from the time it is put, and assuming that it is ready to go, that is under the control of the Wharf Company."

[3] There was testimony by the chief dock clerk of the Steamship Company as follows:

" After we placed the shipment in the designated territory, that is all we have to do with it. If we have broken cases, we set them aside, and the Mallory Line coopers come along and put them into condition, and we are through with it, and it is ready for the Wharf Company to load out. . . . Some of these packages were broken, not a large amount. They were put into condition that day. I would say that this particular carload of sardines was ready to be put on the cars before 4:00 o'clock. After that time we had nothing to do with it. The Mallory Line was through with it. As to whether any of the representatives of the Wharf Company or railroad company had examined this shipment, I say they had. When the damaged cases were recoopered, they put the O. K. mark on them after we recoopered them."

pany stopped work about six-thirty o'clock without loading it, and that it was burned that night. Questions are raised with respect to notice of readiness for loading and as to the checking of the shipment, but it cannot be said that the testimony is so clear and definite on these subjects as to preclude a finding of delivery to the Wharf Company. No receipt had been given by the Wharf Company, but the state court found, upon evidence, that the Steamship Company did not require the Wharf Company to give receipts before it removed shipments from the wharf and that receipts were often given a considerable time after such removal. On points where the testimony permitted conflicting inferences, the state court was entitled to reach its conclusion that the shipment had been placed under the complete control of the Wharf Company to be handled according to its own convenience and hence should be deemed to have been delivered to the Wharf Company.[4]

*Second.* The Wharf Company did not dispute that it was a common carrier. As such, it had facilities and rendered service. It is also manifest that it received the goods for transportation to the connection with the Railway Company that was to take them to destination. This service of the Wharf Company was that of a common carrier furnishing a necessary link in the transportation under the through bill of lading. The Wharf Company was thus in fact and in law a connecting carrier, and that it was not named in the bill of lading is unimportant. The bill of lading, required to be issued by the

---

[4] See *Pratt* v. *Railway Co.,* 95 U. S. 43, 46; *Merriam* v. *Hartford & New Haven R. Co.,* 20 Conn. 354; *Converse* v. *Norwich & New York Transportation Co.,* 33 Conn. 166; *Washburn Crosby Co.* v. *Boston & Albany R. Co.,* 180 Mass. 252; 62 N. E. 590; *Texas & Pacific Ry. Co.* v. *Clayton,* 173 U. S. 348; *Texas & Pacific Ry. Co.* v. *Reiss,* 183 U. S. 621; *Texas & Pacific Ry. Co.* v. *Callender,* 183 U. S. 632; *Oregon-Washington R. & N. Co.* v. *McGinn,* 258 U. S. 409, 413.

initial carrier upon an interstate shipment, ' governs the entire transportation and thus fixes the obligations of all participating carriers to the extent that the terms of the bill of lading are applicable and valid.' *Georgia, Florida & Alabama Ry. Co.* v. *Blish Milling Co.*, 241 U. S. 190, 194, 195. See, also, *Kansas City Southern Ry. Co.* v. *Carl*, 227 U. S. 639, 648; *Great Northern Ry. Co.* v. *Galbreath Cattle Co.*, 271 U. S. 99, 102. Under such a bill of lading, each connecting carrier may be sued for damages occurring while the goods are in its possession, and its liability ' is fixed by the applicable valid terms of the original bill.' It may not vary the terms of the through bill. *Missouri, Kansas & Texas Ry. Co.* v. *Ward*, 244 U. S. 383, 387; *Texas & Pacific Ry. Co.* v. *Leatherwood*, 250 U. S. 478, 480; *Cobb* v. *Brown*, 193 Fed. 958. In this instance, the bill of lading provided that the carrier in possession of the property described " shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided." The Wharf Company became subject to this liability and did not bring itself within any of the exceptions stated in the bill.

The Wharf Company was not entitled to escape this liability upon the ground that it was acting as the agent of the Railway Company. The case of *Missouri Pacific R. Co.* v. *Reynolds-Davis Grocery Co.*, 268 U. S. 366, upon which the petitioners rely, is not in point. There, the Missouri Pacific, the delivering carrier named in the bill of lading, had employed the St. Louis-San Francisco to perform a switching service in making the required delivery at the place of destination. The court held that the Missouri Pacific was the delivering carrier and was liable as such; it could not defeat that liability by the employment of an agent for service at the terminal. In the present case, the Wharf Company was the connecting carrier in possession of the goods at the time of the loss and was responsible accordingly.

*Third.* Equally unavailing is the Wharf Company's defense based upon the provision of its filed tariff, that it should be liable only for negligence. The respondent, the Railway Company, insists that this limitation was by its terms applicable only in connection with the rate for the handling of traffic after it had been loaded into cars and that another rate without such limitation related to the service in loading the goods from the wharf into the cars. Apart from this contention, which is not without force, it is sufficient to say that the attempted limitation of liability in any event did not affect the plaintiffs who were entitled to the transportation of the goods under the conditions set forth in the through bill of lading pursuant to which the Wharf Company was performing its service. As we have said, the Wharf Company was not entitled to vary the liability, as determined by the terms of the through bill, by its arrangements with the Railway Company. *Judgment affirmed.*