**PALMER et al. v. AGWILINES, Inc.**

No. 252.

Circuit Court of Appeals, Second Circuit.

May 12, 1943.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark, of New York City, of counsel), for appellant.

Bailey & Muller, of New York City (Theodore L. Bailey and Julius F. Steinbrenner, both of New York City, of counsel), for appellees.

AUGUSTUS N. HAND, Circuit Judge.

The libellants-appellees, as trustees of the New York, New Haven & Hartford Railroad Company, brought suit against the respondent-appellant, as a connecting common carrier by water, to recover the amount paid by the libellants to Winchester

Repeating Arms Corporation for damage to a shipment of small arms munitions while laden on libellants' covered barge New Haven No. 122, in the course of transit from New Haven to Tampa, Florida.

The damages were due to the sinking of the barge while awaiting transfer by respondent to a steamship which was to sail from New York for Florida on or about November 3, 1938. A through bill of lading for the merchandise was issued by the libellants at New Haven, Connecticut, on October 31, 1938. No bill of lading was issued by the respondent. The barge with the shipment was towed by libellants' tug Transfer No. 19 to respondent's Pier 34, North River, and placed against the north side of that pier about 8 A. M. November 2. Both Piers 34 and 36, and the intervening slip, were leased and used by respondent in connection with its business as a common carrier by water. Upon arrival of the barge at Pier 34, the bargee of the No. 122 delivered shipping documents at that pier to the receiving clerk of the respondent covering both the Winchester small arms munitions and ammunition shipped by the Remington Arms Corporation, which was also on board the barge. The tug Transfer No. 19 made fast the barge and departed. In the afternoon Erie Lighter No. 333 was placed outside of the barge No. 122, and the cargo of No. 333 was unloaded across No. 122. During the same afternoon the shipment of Remington was unloaded by respondent's stevedores and some Winchester munitions in the bow were discharged, but the pier superintendent told the bargee of No. 122 that he would not take off all the Winchester cargo that night. The bargee then left for home (just before 6 P. M.) and at about six o'clock the respondent, for its own convenience and by its own tug President, shifted No. 122 and the Erie barge No. 333 from the north side of Pier 34, across the slip to the south side of Pier 36, making them fast outside the derrick-lighter Belton—No. 122 being the center barge of the three. The employees of the respondent who had been working on Pier 36 then left for the day. During the night of November 2, or the morning of November 3, No. 122 commenced to take in water. This was first discovered by Captain Pascale, of the Erie tug Chicago, when he came into the slip at about 2:35 A. M. November 3, to remove Erie barge No. 333, tied up outside of No. 122. The deckhand of the Chicago notified the watchman on the respondent's pier of the condition of No. 122. The watchman notified the roundsman, who in turn telephoned the New Haven Lighterage Department advising it that the barge was sinking. About seven o'clock in the morning of November 3, the bargee came to Pier 36 and found his barge in a sinking condition. At the request of the bargee, slings were furnished by the respondent and strung under No. 122 as it lay between No. 333 and the Belton, whereupon stevedores and the marine superintendent of the New York, New Haven & Hartford Railroad came to Pier 36 to undertake the salvage of No. 122 and the respondent loaned its lighter Belton to the libellants so that the cargo could be unloaded into it from No. 122.

About 3:15 P. M. on November 3, Merritt Chapman's derrick Century arrived, put a sling on No. 122, raised her and pumped her out, whereupon a piece of wood was discovered to have pierced her hull on the port side between the second and third plank above the bilge log. The hull was patched by a diver and the barge towed to drydock where a survey of the hull was held on November 4. As a result of the sinking and submerging of No. 122 the Winchester shipment was damaged and a claim for this damage, amounting to $6,606.21, was filed by the Winchester with libellants as initial carriers under the through bill of lading. The libellants, as initial carriers, paid the claim, received an assignment thereof from Winchester and filed their libel for recovery of the $6,606.21 which they had paid to Winchester.

It was stipulated by the parties that the Winchester shipment on board the barge was in good order and condition at the time the respondent's tug President made fast to No. 122, and was found by the trial court, on ample proof, that the barge was in good seaworthy condition when she was fastened by Transfer No. 19, on November 2, 1938, alongside Pier 34. The court also made other findings which were in substantial conformity with the summary of the facts we have set forth.

■ Upon the foregoing facts, the trial court granted a decree against the respondent for $6,606.21, with interest and costs, from which the latter has appealed. The court reached this decision because it concluded that the respondent had obtained possession and control of barge No. 122 and her cargo after receiving transfer from the libellants of the shipping docu-

ments and after commencing to discharge the cargo. It also concluded that after the libellants were given notice of the sinking of the barge they did all they could to mitigate damages. We think that the decree in favor of libellants was right and should be affirmed.

The respondent contends that the Winchester munitions had not been delivered for on-carriage at the time when the damage occurred and that if the munitions had been delivered the libellants were negligent in failing to take prompt steps to mitigate damages through salvage of the cargo.

■ We can see no merit in the respondent's contention that the Winchester ammunition was not delivered to it by the libellants. While the portion that had not been unloaded before the sinking still remained in libellants' vessel, the respondent had access to both vessel and cargo, had already removed some of the cargo and was using the barge as its own facility for storage of the goods pending their removal and transfer to one of its steamers.

The decision of the Supreme Court in Galveston Wharf Co. v. Galveston, H. & S. A. Ry. Co., 285 U.S. 127, 52 S.Ct. 342, 76 L.Ed. 659, strengthens what seems to have been the logic of the situation There a Steamship Company which had transported goods from New York to Galveston, unloaded them and placed them on a pier which the Steamship Company, had leased from the Galveston Wharf Co. The cargo had been shipped from Maine to El Paso on a through bill of lading and, when discharged at Galveston, was to be taken by the Wharf Company, a connecting carrier, to the railroad. Before the goods were put on the cars they were consumed by fire. The Wharf Company was held liable for the loss as a connecting carrier in control of the cargo.

In the case at bar the barge and its contents had come within the actual control of the respondent at its terminal. It was as much a means of delivery as a railroad car would have been and might as well be used by respondent for the cargo as one of its own lighters. In re Pennsylvania R. Co., 2 Cir., 48 F.2d 559, 562; Anthony & Jones Co. v. N. Y. C. & H. R. R. Co., 223 N.Y. 21, 25, 119 N.E. 90, L.R.A.1918F, 1085; New York C. & H. R. R. Co. v. General El. Co., 219 N.Y. 227, 235, 114 N.E. 115, 1 A.L.R. 1417; The City of Alexandria, C.C., 28 F. 202; Campbell v. The Sunlight, 4 Fed.Cas. 1187, Case No. 2368; Washburn-Crosby v. Boston Maine R. Co., 180 Mass. 252, 62 N.E. 590.

■ Under the provisions of the Interstate Commerce Act, Title 49, U.S.C.A. § 20(12), the libellants became "entitled to recover from the common carrier * * * or transportation company on whose line the loss, damage, or injury shall have been sustained, the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof." Under the Interstate Commerce Act, Title 49, U.S.C.A. § 3(3), it is provided that connecting carriers "shall, according to their respective powers, afford all reasonable, proper and equal facilities for the interchange of traffic between their respective lines, * * *." Piers 34 and 36 were controlled by the respondent, were the places used for the interchange of traffic between the lines, and the places where the libellants were required to tender the Winchester ammunition for shipment. N. Y. Central R. Co. v. The Talisman, 288 U.S. 239, 53 S.Ct. 328, 77 L.Ed. 721. Irrespective, therefore, of libellant's weighty contention that the respondent was liable as a bailee who had failed to explain the cause of the injury to the barge and of the consequent damage to cargo which it had received in good order, respondent was clearly liable under the Interstate Commerce Act, Title 49, U.S.C.A. § 20(12), to recoup the libellants as initial carriers for the payment they had made for damage to the cargo while in the respondent's possession.

■ The claim that the libellants were negligent in failing to raise the scow sooner is without substance. The respondent was in possession of the scow before it began to leak. Inasmuch as respondent controlled the barge and the cargo, it was under a primary duty to care for both. As soon as the danger to the scow became apparent the aid of a wrecking company was required in order to save the vessel. The wrecking company was summoned by libellants about 2:30 in the morning of November 3, and as soon as they were notified that the barge was sinking, but the company did not arrive with its equipment to raise the vessel until about twelve hours later. There was no proof that a derrick could have been obtained earlier. Meanwhile the respondent did practically nothing to salvage the vessel and is in no position to complain of the libellants who seem

to have secured the aid of the wrecking company and to have done what they could.

The respondent argues that some portion of the cargo could at least have been salvaged if prompt action had been taken to remove it from the barge. But as between the two carriers it was certainly the duty of respondent to have its stevedores remove any cargo from the vessel that was above water, if such removal was feasible. But it contented itself with waiting for the wrecking company and made no attempt to do anything.

The decree is affirmed with costs.