GALVESTON, H. & S. A. RY. CO. et al. v.
AMERICAN GROCERY CO. et al.
No. 1138—5423.

Commission of Appeals' of Texas, Section B.
March 12, 1930.

Kemp & Nagle, of El Paso, and Baker, Botts, Parker & Garwood, of Houston, for plaintiffs in error.

A. H. Culwell, Turney, Burges, Culwell & Pollard, and Fryer & Cunningham, all of El Paso, and Geo. S. Wright and Thompson, Knight, Baker & Harris, all of Dallas, for defendants in error.

RYAN, J.

There is only one question in this case: "In whose possession was the shipment in question at the time of the fire?" and it having been found as a fact, by the trial court and the Court of Civil Appeals, to have been in the wharf company, the Supreme Court is without authority to disturb such finding (Schley v. Blum, 85 Tex. 551, 22 S. W. 667), unless there be no evidence of sufficient probative force to sustain it (Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059), which means that the evidence must be of such a character that there is no room for ordinary minds to differ as to the conclusion to be drawn from it. Radley v. Knepfly, 104 Tex. 130, 135 S. W. 111; First State Bank v. Jones, 107 Tex. 624, 183 S. W. 874; Bock v. Fellman (Tex. Com. App.) 212 S. W. 635.

If there is conflicting evidence, the finding of the trial court and of the Court of Civil Appeals is final, and however much the Supreme Court might differ with those courts, it must abstain from assuming authority delegated to them by the Constitution and laws of this state. Texas & P. Ry. v. Levine, 87 Tex. 438, 29 S. W. 466.

This brings us to the naked question of whether there is, in the record, any evidence of probative force in support of the finding of fact made by the trial court and Court of Civil Appeals, that the shipment in question was in possession of the wharf com-

pany at the time of the fire, and in considering this question we must disregard all contradictory evidence and consider, by itself alone, the testimony tending to sustain such finding. Wininger v. Ry. Co., 105 Tex. 56, 143 S. W. 1150; Cartwright v. Canode, 106 Tex. 507, 171 S. W. 696.

The Court of Civil Appeals made a full statement of the case [13 S.W.(2d) 983], and quoted some of the oral testimony tending to sustain their finding of fact.

In view of the wharf company's contention here that there was no evidence on the subject, we think it proper to supplement the statement of the Court of Civil Appeals.

Mr. Gossreau, general manager of the wharf company, in speaking of his company's methods of handling the steamship's cargoes, testified, that as soon as there is a sufficient lot of goods deposited on the wharf, the labor forces of the wharf company are put to work, under supervision of the check clerks, to load such goods into cars.

"So far as the handling of the cargo is concerned, the first thing the Galveston Wharf Company does is to pick it up and load it in the cars. The Galveston Wharf Company picks up this cargo at Pier No. 24 and takes it to the cars for the account of the so-called Galveston Bay Lines, consisting of the I. & G. N., the M. K. & T., the G. C. & S. F. and the G. H. & S. A. Railways. If it is going over the G. H. & S. A., we pick it up and put it on the cars for the account of the G. H. & S. A. The G. H. & S. A. pays us for this in accordance with the loading charges under our Tariff No. 18.

"When this cargo was unloaded that day, our records show that during the day the Galveston Wharf Company loaded into cars 45 cars of checked freight and 16 straight carloads from the 'Concho.' The Galveston Wharf Company, between 8:30 and closing time that day had loaded from Pier No. 24 out of the cargo of the 'Concho' this many cars. The Galveston Wharf Company did not begin as soon as the boat began. * * * We receive compensation for one service from the Bay Lines, and we receive compensation for another service from the Mallory. When the boat comes in, the Mallory, in addition to the rental, in accordance with Local Tariff No. 18, under Section 3, would be assessed as follows: 'Rates and rules governing the handling of traffic over the wharves and piers of the Galveston Wharf Company,' wharfage rates in cents per hundred pounds, except as otherwise provided, applying on import and coast-wise traffic inward. * * * We, of course, perform the additional service of switching the cars. After loading the cargo we switch the cars from the track of the Galveston Wharf Company to the line of the G. H. & S. A., and they pay for that service. * * * There is no receipt given for

any freight handled for the Mallory Line until such a service has been actually performed. We don't give a receipt until we pick the cargo off their leased pier and load it on the cars. In the course of dealing there with the Mallory Line and the G. H. & S. A., we did not at any time render any service other than what I have detailed about picking it up and loading it on the cars on behalf of the G. H. & S. A., and the use of the piers to the Mallory. These are the only two services we render. These are the only two we get any compensation for. * * * The loading by the Wharf Company of the cars from this cargo into the cars of the Bay Line is a good day's work. The ship knocking off at 5:30, it would take our forces a little after that to finish. The record indicated the last labor forces knocked off approximately at seven. * * * It has been the practice for many years that when the 'Concho' came in there with this cargo, it is unloaded on the wharf, and we pick it up and put it on the cars. The cargo we did pick up and load into the cars, and the G. H. & S. A. paid us for those cars under the tariff we have just referred to for the loading charge, and so did all other lines for whom service was performed. Now, if the fire had not occurred, and we had picked up this cargo of sardines and placed it in the cars, under the practice and course of dealing the G. H. & S. A. would have paid us for loading charge outlined in the tariff. When we give a receipt to the Mallory Steamship Company after we have checked the cargo and loaded it into the cars, we give it for the account of the interested Galveston Bay Line. Absolutely, we never give a receipt as of date or time prior to our picking up the cargo and loading it into the cars. It is given only on the date the freight actually is picked up and loaded into the cars. * * * At the time this fire occurred in January, 1926, where a steamer of the Mallory Line docked and unloaded its cargo on Pier No. 24, after that cargo was unloaded on Pier No. 24, the first thing the Galveston Wharf Company did in reference to said cargo would be to pick up the cargo and place it in the cars for the account of the Galveston Bay Line concerned. That was the only thing the Galveston Wharf Company did with reference to the cargo after it was put on Pier No. 24, except that after loading was accomplished, the cars would be switched to the respective rail line, and for this switching another charge was made, a switching charge. * * * Before the steamer arrived, the billing was furnished, according to the testimony of the Mallory line, to the Galveston Wharf Company, and that is correct. When the billing was furnished our clerks made entries from billing into the check record book. This book was for the purpose of checking the freight as it was loaded. After we did that, we would send the billing to the interested rail

line. * * * As to when the billing would be given in reference to the arrival of the ship, it would depend, usually it gets in a couple of days ahead of the arrival of the steamer. Sometimes it misses entirely, but that is unusual. As a rule it would be delivered to the railroad before the steamer arrived.

"At the time this fire occurred, the Mallory Steamship Company did not have any depot or other place for the reception of freight, or unloading of freight, or for receiving of out-bound freight, other than those piers there at Galveston. * * * That is the only place where they transact their business of receiving freight and discharging freight, on these piers that they rent from us. * * * Of course, if we had anticipated that there would be a fire that night, I might have gotten extra employees and loaded those cars.

"The Galveston Wharf Company did not receive any compensation for rendering any service either to the steamship lines or rail lines or anyone else, except for picking up the cargo from Pier No. 24 and taking it to the cars, and then switching the cars, and the wharfage charge to the steamer. * * * I think the Galveston Wharf Company is recognized as a common carrier. I believe it has been declared so by the Interstate Commerce Commission. We make the same reports to the Interstate Commerce Commission that other common carriers make. We have approximately fifty miles of trackage and operate some eight or ten engines. We own eight. We have our own crews, our own yard forces. We operate our own yards and anything that comes into the Galveston Wharf that is bound inland is handled by the Wharf Company to the junction of the connecting line. * * * I am sure it is the practice that at about the time of the departure of the 'Concho' on the present voyage 112, the bills of lading covering the shipments that are in that boat are forwarded immediately by United States mail to the Mallory Line at Galveston. The Mallory forces and our check clerk forces had connecting offices on Pier No. 25. These bills go down to the Mallory Line clerk, and he passes them to our clerk. We make the necessary entries and pass these bills to the interested line that is going to handle it out of Galveston. Now, as a rule, all the work has been accomplished before the arrival of the boat. Before the arrival of the boat we turn over the same way bills that are turned over to us to the connecting carriers. * * * When the boat got to Galveston, so far as I know there was no difference in handling of the 'Concho' on Voyage 112 from others. When that boat got to the pier and docked, the forces of the Mallory unloaded it. * * * They have electric conveyors, but the custom there is to place the cargo in certain places as much as possible. There is, in a general way at least,

a kind of assigned territory there for different rail lines. The cars are spotted opposite in the same manner. The night before this boat got to Galveston, both the Galveston Wharf Company and the G. H. & S. A. should have known from the billing that there was a car of sardines on that boat destined for El Paso, routed over the G. H. & S. A., or S. P. Our forces are at liberty to begin the loading as soon as the freight is put on the wharf, but the practice is to wait until there is a sufficient amount deposited there to keep the labor busy. Otherwise it is not a paying investment. It is our privilege to begin loading as soon as it is put on the wharf, unless a hold order is put on some specific shipment, which happens only occasionally. So that as soon as freights were deposited on the wharf by the forces of the Mallory, there was nothing to prevent our forces from immediately picking it up and trucking it to the cars. That was all left to the judgment and discretion of the Galveston Wharf Company's supervisor of forces on the docks. It was not a matter within the control of the Mallory Line. * * * We try to spot these cars that take out S. P. freight on the tracks that are most convenient to pick up the freight that goes out on that line. On the day of the fire these cars had been spotted in the usual manner, and the cars were there. As the freights were placed on the wharf by the Mallory Line, it was purely a matter of the Wharf Company to determine just how and when to load the particular shipment in the usual manner. * * * We had access to the billing. We knew its destination. I notice that the original bill of lading has a notation 'Rush with Tracer' * * * A notation of that kind should be given some attention. It ought to be recognized. As to whether on these assumptions that the Mallory Line did its duty and unloaded it, and the evidence showed that everything was all right by four o'clock and that shipment ought to have been loaded out, I cannot say. If such a notation appeared on the billing, it should have been recognized, it seems to me, and some effort made to get it out. I would have attempted to do it. The Galveston Wharf Company tries to do that way. * * * After this shipment had been placed at the designated point, you ask what else in the further handling of that shipment was there to be done by the Mallory. There was the coopering feature. After this had been O.K.'d and it was all right in every respect and deposited there by the Mallory Line, the next thing in order would have been the loading into the cars by our forces if it was ready to go. It is the Mallory Line's usual performance to deposit it on the floor, and it is picked up and loaded into the cars by the Galveston Wharf Company. As to the particular time it is picked up, that is wholly in control of the Wharf Company. After it had been placed, and it was O.K.'d to go, we were

at liberty to pick it up and send it forward at any time we got ready, and it was not necessary for us to ask permission of the Mallory Line about it. Unless there is some special feature connected with it, as a hold order, the usual course is to load it and get rid of it. So far as the actual physical handling of the shipment from the time it is put, and assuming that it is ready to go, that is under the control of the Wharf Company. The Mallory Line never has required, so far as that boat is concerned, for us to give them a receipt for what we picked up before we loaded it. If they had requested it, I am sure they would not have got it. * * * As to whether the giving of the receipt has anything to do with the picking up of the freight and moving it, the freight is moved and must be loaded into the cars before the receipt is given. Whether we generally get these receipts to the Mallory for two or three days afterward depends. We endeavor to give them receipts as soon as we can. Of course a receipt cannot be given the same day, because everybody is busy loading the stuff. We cannot double our forces just for that express purpose. Yes, we endeavor to handle the freights that are loaded during the daytime on the cars promptly and move them out promptly. If we get a car loaded that is going to the G. H. & S. A., if we have several, we try to wait until they are all loaded and make a cleanup in the movement. We make the endeavor to get them out that night to our connecting lines in time sufficient to have them put in their fast trains, so that they will get to destination without delay. * * * The railroads in turn move these shipments out of Galveston just as fast as they can. In the meantime the Mallory Line has no receipts. It gets its receipts the following day, or as soon thereafter as possible. In the meantime the freights are absolutely gone so far as the Mallory is concerned, and I think they depend upon the well-known integrity of the Wharf Company to see that the receipts are forthcoming. It is just a matter of confidence, but in the meantime the possession of the stuff is away from them and out of them. It has left their possession. * * * I think the record shows that on the day of the fire we had about 150 men at work. That was about the average force. We used them right along, because they had become efficient in the service and knew what was expected of them. * * * There is a decided difference in the handling on the Galveston Wharf Company's wharves and that on the Morgan Line. The freight on the Mallory Line is deposited on the floor of the pier. The Morgan Line, in loading their ships at New York loaded them in a manner that will insure the different commodities coming out of that vessel and that will permit them, on its arrival at Galveston, to load direct into cars, and that is done with very efficient effect with the Morgan Line. With the Mallory Line we cannot do that, because in their loading scheme they don't load freight in the ships that will permit of such. We have asked the Mallory Line to do that time and time again, but it seems impossible to get the New York end to work up to that efficiency. * * * This ship was unloaded on the first day, and the records will show that the Wharf Company did not entirely load it out on the cars. If we had had a sufficient force of men there, I do not think we could have loaded all the cargo on that day. We had the usual force, and the same labor at the Mallory as usual. * * * In this particular instance the usual handling, so far as the Wharf Company is concerned, for account of the Galveston Bay Lines was given. It is not a fact that the question of the saving of expense to the Wharf Company was the prime reason that these shipments were not all moved onto the cars that day. We load shipments, or load cargo from shipments, and have put in some overtime occasionally. We do that because we want to give dispatch to the stuff. I believe I have already stated that these loads have to get to connecting lines in sufficient time to be put into their trains. * * * Our failure to load out all of the cargo was not entirely to prevent overtime. A delivery to the connecting lines has considerable to do with it. Our switch engine forces have to be given a reasonable length of time to switch these cars. They have to get them together. You know they do not all go to one railroad. They have to make delivery to three different yards.

"The record shows that there were two other cars going over the Southern Pacific to El Paso that came out. I suppose the other cars had special rush orders on them. From the bill of lading it would indicate that this car had rush order on it. * * * As I stated before, these carloads are often placed on the wharf by the Mallory Line to insure a very short trucking on their part, cutting down their trucking expense. It is apparent that three cars of El Paso freight were placed on the wharf. At what point on the wharf I am unable to say. I think the record shows that our forces did pick up the two cars that came forward. There was no one else to pick them up. We were not just as much in possession of the third car there as we were of the two that came forward. Personally, I cannot say that there was any reason why the two cars were picked up and the one was left. There was no one connected with the Mallory Line that I know of that prevented us from picking up the third car. It is possibly so that if we had been willing to pay overtime there was no reason why this car could not have been loaded. As already stated, that carload was handled approximately in the same manner as all other cargo. We aimed to finish about seven o'clock, and

apparently there was no rush order or other special request on this particular car, or I am confident the same would have been loaded. I do not know whether there was any rush orders on the two cars for El Paso. * * *

"I have stated that the Mallory Line had no other depot at Galveston. As to whether we have any other depot, where we pick up freight our property extends from Piers 10 to 41. The particular wharf where this unloading is done is not our depot. That particular wharf is the depot of the Mallory Line, allocated to it for the express purpose of handling inbound and outbound cargo. The Wharf Company had absolutely nothing to do with it. The allocation was for the account of the Mallory Line. The Wharf Company was interested only in loading out the freight into cars and unloading cars destined to the Mallory Line northbound. The property is ours, but it is allocated to the Mallory Line. Our forces work there in the performance of the duties for the account of the rail lines, in picking up this stuff and loading into cars and unloading from cars, and placing in their northbound berths for loading into their steamers. Our clerks have offices there. We have representatives and clerks on every pier. They cover a certain territory where a similar service is performed for other steamship agents. As already stated, numerous times we load the stuff for account of the rail lines at that pier as well as at other piers. They are all our piers and are all allocated to steamship agents. They are allocated to the steamship agents, so that they can unload there. That is what they pay us for. I cannot say we use it for our own good. It is a facility of ours from which we are supposed to make money. Of course we do enjoy some revenue on the wharfage, but as already stated, it is a losing proposition on the handling of freight. * * * It is not true that when the Galveston Wharf Company's loading forces see a shipment placed out of the boat on that wharf, that is going forward, we regard that as notice from the Mallory Line that this stuff is here ready to go forward and pick it up. We would know that the freight is placed there for the purpose of loading into cars. Now, the usual practice is to pick it up when these carloads are made complete and load it into cars for account of the interested Galveston Bay Line. * * * The practice is that when it is found that such carloads are ready to go, when no exceptions are made by rail line representatives, or otherwise, that it is there for our forces to pick up for the account of the Galveston Bay Line, and load into cars. * * * As to the understanding at the time of this fire as to when the Galveston Wharf Company took possession, the general understanding was that the shipments are taken possession of when they are lifted from the floor of the pier and deposited in the cars by the Galveston

Wharf Company's forces for account of the Galveston Bay Lines. * * * It is possible that this same train takes the Morgan Line freight. I could not say positively. I understand that the Morgan Line works at night."

Mr. Bertram, dock superintendent of the steamship company, testified, that the ship docked at Galveston at 8:15 a. m. on January 13, 1926, and berthed at the wharf company's Piers No. 24 and 25, and commenced discharging its cargo working approximately 250 men.

"As soon as the vessel leaves New York the Mallory Line forwards the billing and storage plan of the shipment, by mail from its New York office to Galveston, on ship sailing Wednesday from New York, and this would reach Galveston Saturday or early Sunday morning. When we get this billing and storage plan in Galveston, the billing is entered into check-books by the check clerks of the Mallory Line, and then turned over immediately to the check clerk of the Galveston Wharf Company. This is all accomplished at least two days before the vessel gets to Galveston. This was done relative to this voyage. Two days before the 'Concho' arrived in Galveston we had furnished the Galveston Wharf Company with the billing and tonnage of the storage plan, so that at the time the ship arrived the Galveston Wharf Company knew the contents of the vessel. * * * The information we furnished to the Wharf Company, which they had before the vessel reached Galveston, gave them full information relative to this particular shipment, its location on the vessel, its ultimate destination, S. P. to El Paso. We actually began unloading this ship about 8:30 a. m. January 13, 1926. We had completely unloaded the vessel that day at about 5:30 p. m., January 13, 1926. It is my recollection that this car of canned goods, of sardines, had been placed upon the wharf sometime between 2:00 and 3:00 o'clock in the afternoon. It is my impression that this shipment had been unloaded and placed on the wharf prior to 3:00 o'clock in the afternoon. As to who designates the place on carload shipments, it is understood and agreed that they be discharged opposite the part of the ship where they are stowed. A shipment stowed in the forward end of the ship is discharged opposite the forward end, and shipments in the aft end are discharged opposite the aft end. * * * This shipment was in the forward end, and it was discharged in that territory that was adjacent to the forward end of the vessel. It was discharged adjacent to the railroad tracks. The Galveston Wharf Company has tracks onto the wharves. The tracks of the Galveston Wharf Company that lead from the wharf at the ship's side connect with the railroads out of Galveston. There is a connection track between the track of the Galveston Wharf Company leading

to Piers Nos. 24 and 25 that immediately connects with the G. H. & S. A. Railway Company. This shipment was destined to leave Galveston over the G. H. & S. A. Railroad. Cars were placed for the loading of this shipment the night before the arrival of the vessel, on Tracks 1, 2, 3, 4, 5 and 6, is my recollection, and possibly 7, and these tracks are adjacent to the place where the freight of the forward end of the boat is unloaded. It is about 70 or 80 feet, probably, from the point on the wharf where we place the goods to the adjacent railroad tracks. When the goods are discharged on the wharf by the Mallory Line, the Galveston Wharf Company handles it from that point. The Mallory Line does not have anything to do with the loading of the cars. The Galveston Wharf Company loads these cars. It has a bunch of men there for that purpose, and did on this occasion. The Galveston Wharf Company was actually loading cars there that day. There were 1081 tons in that boat. There were 206 tons of L. C. L. and 780 tons of car load. The Galveston Wharf Company did not finish the loading of this shipment on that date. They quit in the afternoon, according to my recollection, about 6:30 p. m. January 13th. The fire occurred that night. They loaded out on that day 206 tons of L. C. L. freight, and car-load freight amounting to 401 tons, I believe. That left there for loading next day, or whatever time they chose, 379 tons. I have had a great deal of experience loading freight from ship-side to cars. The Morgan Line also operated into Galveston. It was possible for the Galveston Wharf Company to unload all the freight we unloaded for them that day. They did not work continuously that day in unloading L. C. L. freight. They were interrupted. They took the crew off that day to unload cars at the loading pier, so they were not at work continuously loading the shipment out that day. Had they kept the work up regularly, it could all have been loaded on the cars that day. Our force unloaded the vessel and put the shipments at convenient places on the wharves as designated. Assuming that there are no broken packages, we do no further handling of a shipment. The Galveston Wharf Company does. Relative to the time when we have placed our shipment at the designated places on the wharves, so far as the Mallory Line is concerned, the Wharf Company may load it out immediately. This shipment moved on through bill of lading from point of origin to El Paso. The billing was already in the hands of the Wharf Company. It knew the ultimate destination. We have nothing to do with the placing of the cars nor with the ordering of the cars in, but the Galveston Wharf Company does. * * * We generally get a receipt from the connecting line approximately two days, not sooner, after we have finished our physical handling of the shipment. We do not require the Galveston Wharf Company, or the connecting railroad, to give us a receipt before we permit them to move the shipment from the point where we put it on the wharf. They just take it. The car is not held until we get our receipt. In other words, they go ahead in handling without reference to giving a receipt, and when they get to that order of business, they send us down a receipt. We do not demand any receipt before we let them have the freight. Relative to this car of sardines, we would have permitted the Galveston Wharf Company or the G. H. & S. A. Railway Company to remove the shipment from the point where we had placed it on the wharf without a receipt. In the usual and customary handling of freight over the wharf from the vessel, after we have placed a shipment at the designated point on the wharf, the only thing else, if anything, the Mallory Line has to do with the shipment is to repair the bad order packages. Assuming there are no bad order packages, we have nothing further to do with it. There were some bad order packages in this shipment of fish. I would not say the number of cases, but there were a few cases that were broken and required fixing.

"As I said, we got through unloading the vessel at 5:30 p. m. At that time the cars were in there on the tracks for loading out freight. I understand there were 70 cars. The trackage there would accommodate approximately 100 cars, probably more. There were enough cars there to take care of all the freight on this boat. I do not know how many were left over that night. The fire occurred sometime between 11:00 and 12:00 o'clock p. m.

"The Galveston Wharf Company uses their wharves for other purposes besides handling shipments from the Mallory Line. It is the rule for the Wharf Company not to work at night in loading cars, unless all shipments can be loaded before 9:00 o'clock that night. These shipments could have been loaded before 9:00 o'clock that night. They quit working about 6:30 p. m. and had not been working continuously during the day. I understand they had been working about twelve gangs of about twelve men to the gang, or about 144 or 150 men. There were other shipments in that boat destined for El Paso. There was a carload of coffee and a carload of wire. They were unloaded by the Mallory Line and put on the wharf in approximately the same location as the sardines. They were taken out that day by the Wharf Company and the railroad. They did not give any receipt for it before they moved it. They did not ask our permission whether they could move it or not. When we set it down there, they picked it up and took it on. This third car they did not take up. We got no receipt after the other two cars destined for El Paso

moved out, unless they were signed in the meantime. I am not familiar with that. I do not know what character of receipt was issued. I don't know of my own knowledge, but I did not get any receipt. * * * It is a fact that on this particular day this 'Concho' ship unloaded, a large number of cars had been loaded by the Galveston Wharf Company. In every one of those instances they picked up the freight from where the Mallory Line had deposited it on its Pier No. 24 and took it to the cars, and we later got a receipt for each of those cars that were loaded from the Galveston Wharf Company as of that time. * * * In reference to the recoopering of these packages, it is true that in carload shipments the recoopering is done right on the spot. The recoopering on these particular packages had been accomplished by 5:30 p. m. It had been completed, according to my best recollection, somewhere before 4:00 o'clock. At 5:30 o'clock, when we ceased to work, so far as outward appearance of the packages was concerned, all of this shipment was in condition to go forward.

"In answer to Mr. Wright's question a while ago, I stated that we always get a receipt from the Wharf Company. It is a fact that sometimes we are delayed and have to take the matter up through Mr. Rennie's office to get the receipts. We have been delayed in some instances as long as a week or ten days in getting the receipts. We do not depend on getting the receipts before letting the shipment go out of Galveston. We never hold the shipment up because we have no receipt. We never get a receipt before we let them put it in the car. The purpose of the receipt is to check against overs and shorts at destination. So, as a matter of custom which has prevailed at that place for many years, we have never deemed it essential to get a receipt from the Wharf Company before we let them have possession of the goods. The Mallory Line has no control whatever over the employees of the Wharf Company who handle these shipments from the place on the dock to the car. We give them no directions. We never undertake to do so. * * * I think the Wharf Company gives the Mallory Line these receipts in the name of the railroad company, connecting carrier, by the Wharf Company. In other words the Wharf Company gives the receipt in the name of the railroad. They sign on account of the railroad. If it is going over the G. H. & S. A. Railroad, they give it 'G. H. & S. A. Railway Company, by Galveston Wharf Company.' The employees of the Wharf Company do the receipting, I suppose, for the railroad. The Wharf Company does the receipting, but I am not clear as to whether they do it for the railroad or not. I have no receipts given to me for the cargo unloaded that day out of this ship. I have none of them here. I don't handle this

myself. I know there was no receipt given by the G. H. & S. A. or the Galveston Wharf Company for any sardines. We did not hold it up because we did not have the receipt. We did not hold it up at all. While these sardines were on the wharf, they were policed by employees of the Mallory Line in part. They were not policed by any railroad police."

Mr. Schulte, chief dock clerk for the steamship company, testified:

"I remember the arrival of the Steamship 'Concho' in Galveston on the morning of January 13th, 1926. I was there and had something to do with placing the freight on the dock. I was at work on that day. My duties are to see that the freight is placed on the dock and ready for delivery to the Wharf Company. I look after and see that the clerks are there to check the L. C. L. freight to the dock. I have other duties on the dock. When I say check L. C. L. freight on the dock, I mean we have check clerks who check the freight. The freight comes out of the ship and is taken to the designated territories, and we have check clerks near where they put the L. C. L. to check them to the pile.

"I remember this shipment of sardines. It was unloaded from the boat that day and placed on the wharf. As you come out of the conveyor, it was placed south of the gangway about 60 feet from the conveyor, I would judge. As you come out of the ship, you go west, and it was placed south of the gangway, where we generally place carload shipments on the dock. We have an electric conveyor. As soon as the shipment comes off the boat, it gets on that and is automatically carried to the designated place. This shipment was so placed on that day. Trucks came off the conveyor and took it to the pile and unloaded it in a pile on the dock. I remember it was on dock in the early afternoon. I could not tell the exact time. I judge it was before 2:00 o'clock. This was a car-load shipment. After we placed the shipment in the designated territory, that is all we have to do with it. If we have broken cases, we set them aside, and the Mallory Line coopers come along and put them into condition, and we are through with it, and it is ready for the Wharf Company to load out. The Wharf Company does the loading of the cars from the place we put it. We have no voice in saying when they shall do that. They do that at their own pleasure and convenience. Some of the packages were broken, not a large amount. They were put into condition that day. I would say that this particular car-load of sardines was ready to be put on the cars before 4:00 o'clock. After that time we had nothing to do with it. The Mallory Line was through with it. As to whether any of the representatives of the Wharf Company or railroad company had examined this shipment, I say they

had. When the damaged cases were recoopered, they put the O. K. mark on them after we recoopered them. This was done by a representative of the railroad. The railroad has more than one clerk on the dock. The man representing the railroad company that O. K.'d these packages represented the railroad, but I could not tell you what man. I know he represented the railroad. As to how I know, Mr. Reed is representative of the railroad, and his man was the man at the pile. Mr. Reed was there at this time. As to whether I saw Mr. Reed there, he was on the dock somewhere. I remember seeing him on the dock. All the railroads have a common representative there. Mr. Reed represents them as joint line inspector. Mr. Reed's man had O. K.'d this shipment and put their O. K. on it. The Mallory Line coopers do not recooper until Mr. Reed's man puts an O. K. on. They have a stamp, and then the Mallory Line recoopers or nails up the cases and fixes up the cartons, whatever it is. A representative of the joint railroad interests stands around when men are recoopering and sees that it is done, and then stamps it. That was done in this case. They do not put an O. K. on anything but broken packages. The only movement of car-load freights that are in good condition is a placement on the wharf by the Mallory Line, and it is taken up by the Wharf Company and carried on. That is all there is to it. When there is reconditioning to be done, then it has to be O. K.'d by a joint representative of the railroads when we get through recoopering. That had been done in reference to these broken cases. Mr. Reed is a joint line inspector employed by the railroads and represents the railroads on the dock. He is there as the joint representative of the Bay Lines, I think. The G. H. & S. A. Railroad is one of the Bay Lines. There are three different sets of clerks work on the dock. The Mallory Line has a set of clerks, the Wharf Company has a set of clerks, and the railroad company has a set of clerks. There are two kinds of labor on the dock, the Wharf Company labor and the Mallory Line Labor. So far as the clerks are concerned, it is divided into three classes. The labor is what moves the freight. The clerks check it. The Mallory Line places the shipment on the dock and the Wharf Company picks it up. This car-load of sardines was ready to go forward from the point where it had been placed by the Mallory Line by 4:00 o'clock in the afternoon. After that time the Mallory Line had their coopers on the dock. After this particular shipment had been reconditioned and was there in position, there was no other labor relative to it that was to be done by the Mallory Line. * * * Yes, I have something to do with the handling of the billing. It is sent from the post office to the city office, and then to the dock to me. I separate it, and we write our books. As we go along, the Wharf Company, as a rule, comes and gets the billing. The billing is turned over to them when we finish. As a rule, they generally follow us along. We have adjoining offices on the wharf. When we get through handling this billing, which comes by mail from New York, we pass it on to the check clerks of the Wharf Company. This is done from one to two days before the arrival of the steamer. The Galveston Wharf Company and the G. H. & S. A. Railway Company prior to the arrival of this vessel to port, had notice that there was a car load of sardines, destination El Paso, Texas, because they had the billing on it. I got my information that the G. H. & S. A. Railway Company had notice of this, because we had turned the billing over to the Wharf Company's clerks, and they generally, as a rule, write the billing right after we turn it over to them, then when they finish, they send it out to the railroad. That is generally done the day before the arrival of the steamer. That is the practice. This has been done time and time again, and I am assuming that they followed the customary practice. There was no different method of handling the billing on this car than we usually did on others. It was all done the same way.

"I had something to do with getting receipts from the Wharf Company for freights. When these receipts finally get to me, whenever that may be, they are executed by the Galveston Wharf Company. The receipts we get for the shipments come from the Wharf Company and are signed, 'Galveston Wharf Company.' We do not get these receipts before the freight is taken off. We permit them to load the freight into the car without taking a receipt. We do not hold the car in Galveston until we get the receipt. There was a time when it would be, may be, a week after the arrival of the freight and placement on the dock by us before we got a receipt. Here lately they have been doing better, sometimes two or three days. We never get receipts for shipments prior to the loading into the cars, and we have never required that they give us receipts before they move the freight. * * * It is a fact that when this billing comes before the boats arrive, and our check clerk gets it, we then turn it over to the check clerks of the Wharf Company. It is a fact that the Wharf Company's clerks enter a record of these shipments in that billing on the books, just like the Mallory Line. * * * It is not a fact that if the Wharf Company had begun to move these sardines on this platform that evening, they would have checked those sardines. We do not check to know what we have delivered. As to whether we depend on the Wharf Company to check, we place them on the dock and consider that our delivery. * * * In this particular shipment there were a lot of carloads out of the 'Concho' loaded by the

Wharf Company into cars on this particular day. Yes, we may have gotten receipts later for each of those cars. In the course of business we would have gotten receipts for them, and these receipts would have been dated as of the time the Galveston Wharf Company took those carloads off the wharf and took them to the cars. * * * The receipt would not show the time the Galveston Wharf Company took the freight off the wharf and took it to the cars. It would show the date it loaded it out, and we never get a receipt from the Galveston Wharf Company showing that they received the goods any time before the loading date. * * * Assuming, in the regular and ordinary handling of this business as it has been customarily conducted for many years between the Mallory Line and the Wharf Company and the railroads, if this shipment had been put in the cars and gone out of Galveston, we never would have received any receipts from the railroad company. The only receipts we would get would be from the Wharf Company. I know the method of handling what is called package freight coming in off the boats.

"When and after the goods are loaded on the cars, we get a receipt, and we do not get a receipt until the goods are loaded on the cars. We did not get any receipt with reference to this shipment of sardines."

The above excerpts, we think, sustain the finding of fact, that delivery to the wharf company was complete and it was in absolute and unconditional control of the shipment, and it was of no further concern to the steamship company. It is true that Mr. Gossreau did also testify that the steamship company handled the salvage from the fire, but that was only one of the many facts and circumstances in evidence to be considered and weighed in finding the ultimate fact; its effect was only to produce a conflict in the evidence which was solved against the wharf company by the trial court. It was not, of itself, a predominant and controlling circumstance, but like all others must have been given its proper consideration, the trial court being the judge of the credibility of the witnesses and the weight to be given to their testimony.

It is true that the wharf company would give receipt to the steamship company, several days after cargoes were loaded, but this receipt would always be dated, not as of the time the steamship company unloaded and turned the goods over to it, but as of the time they were loaded onto the railroad's cars; such receipt, therefore, is not a controlling fixing of the precise time when the wharf company's responsibility began, because it had possession and responsibility from the moment the steamship company surrendered possession to the wharf company, and until the latter turned the goods over to the railroad.

The trial court concluded as a matter of law, under the facts found, that the wharf company alone was liable to plaintiffs for the loss sustained, but the Court of Civil Appeals held that said company was only the transfer agent of the railway company and had possession of the destroyed goods, as such agent, and, therefore, reversed the trial court's judgment against the wharf company, and rendered it against the railway company.

■■ It is unnecessary for us to decide whether or not the wharf company is a common carrier, for the purposes of this case; it is, in any event, a transportation company, on the authority of Texas & P. Ry. Co. v. Henson, 103 Tex. 598, 132 S. W. 118, and as such is liable to the plaintiff, or to the company for which it acts in the transportation of goods, for all damages resulting from its negligence in so doing.

"Agency" presupposes a directing principal and a directed agent under delegation of authority to the latter, either by contract, express, or implied, or by operation of law, estoppel or ratification. Colvin v. Blanchard, 101 Tex. 231, 106 S. W. 323; Milwaukee Nat. Bank v. City Bank, 103 U. S. 668, 26 L. Ed. 417; Elliott on Contracts, § 2832.

An agent is one acting for another in the transaction of some lawful business. Williams v. Moore, 24 Tex. Civ. App. 402, 58 S. W. 953; Gibson v. Gray, 17 Tex. Civ. App. 646, 43 S. W. 922. The agent is the alter ego —the other self—of the principal, and his authority is of the character bestowed upon him by the principal. Mechem on Agency, § 278.

■ The uncontradicted proof shows the wharf company to be an independent actor, under no control of and subject to no directions from the railroad company; it exercised its own judgment as to when and how it would do the loading onto the cars. During the day of January 13, 1926, the wharf company actually loaded out some 45 cars of the Concho's freight, all of which was done as best suited its convenience; it employed and discharged its own help and fixed their hours of labor and the manner in which they worked.

On the other hand, the railroad company had a sufficient number of cars waiting to take and forward to destination the entire cargo, since the night before, and would have done so, but for the wharf company's failure to move them onto the dock for that purpose. The railroad company was in no manner at fault.

We therefore conclude that the wharf company alone is liable, and recommend that the judgment of the Court of Civil Appeals be

reversed, and that of the district court be affirmed.

CURETON, C. J.

The judgment of the Court of Civil Appeals is reversed, and that of the district court affirmed, as recommended by the Commission of Appeals.