GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY
ET AL. V. AMERICAN GROCERY COMPANY ET AL.

No. 5423.   Decided March 18, 1931.
(36 S. W., 2d Series, 985.)

2

*Kemp & Nagle,* of El Paso, *Baker, Botts, Parker & Garwood,* and *John P. Bullington,* all of Houston, for plaintiff in error, Galveston, H. & S. A. Ry. Co.

The holding by the Court of Civil Appeals at El Paso to the effect that the Galveston Wharf Company did not hold the car-

load in question as a common carrier or connecting carrier, but merely as agent for the Galveston, Harrisburg & San Antonio Railway Company, is not tenable. Chicago, R. I. & G. Ry. Co. v. Young (Civ. App.), 107 S. W., 127; Gulf, C. & S. F. Ry. Co. v. Hines (Civ. App.), 4 S. W. (2d) 641; St. Louis S. W. Ry. Co. v. Jackson, 118 S. W., 853; Rio Grande, E. P. & S. F. Ry. Co. v. Kraft (Civ. App.), 212 S. W., 981; Texas Constitution, Art. 10, Sec. 2; Texas Law Review, Vol. VIII, No. 2, p. 135; Texas & Pac. Ry. Co. v. Henson, 103 Texas, 598, 132 S. W., 118; Texas & P. Ry. Co. v. Scoggin (Civ. App.), 90 S. W., 521; Union Stockyards Co. v. United States, 169 Fed., 404; United States v. Northern Pac. Ter. Co., 181 Fed., 879; Washington ex rel. Stimson Lbr. Co. v. Kuykendall, 275 U. S., 207; Kansas City S. Ry. Co. v. Rosebrook-Josey Grain Co. (Civ. App.), 114 S. W., 436; Lancaster v. Hollebeke, 235 S. W., 1114; Missouri P. Ry. Co. v. Reynolds-Davis Grocery Co., 268 U. S., 366; Missouri P. Ry. Co. v. Wichita Wholesale Grocery Co., 40 Pac., 899.

If the Galveston Wharf Company held the carload of sardines in question merely as agent, it would not be as agent for the Galveston, Harrisburg & San Antonio Railway Company but for the Mallory Steamship Line. Revised Statutes of Texas, Art. 1491; Gulf, C. & S. F. Ry. Co. v. Cage & Co., 174 S. W., 855; Peoria & Pekin U. R. Co. v. Chicago, R. I. & P. Ry. Co., 109 Ill., 135.

That delivery had not been made of the carload of sardines in question at the time of the fire, but the same was still in the possession of and under the control of the Mallory Steamship Company. Texas & P. Ry. Co. v. Clayton, 173 U. S., 348; Texas & P. Ry. Co. v. Callender, 183 U. S., 632; Richardson v. Goddard, 64 U. S., 28; Pratt v. Grand Trunk Ry. Co., 95 U. S., 43.

*Thompson, Knight, Baker & Harris* and *George S. Wright*, all of Dallas, for plaintiff in error, Galveston Wharf Company.

The Wharf Company was acting as the agent of the delivering carrier named in the bill of lading, and at the time of the loss and damage by fire, if the shipment in question was in the possession of the Wharf Company in any capacity, it was in its possession as the agent of the Galveston, H. & S. A. Railway Company and not as a connecting carrier and the Wharf Company would only be liable for negligence. Missouri Pac. R. R. Co. v. Reynolds-Davis Grocery Company, 268 U. S., 366, 69 L. Ed., p. 1000, 45 Sup. Ct., 516; Texas & Pac. Ry. Co. v. Scoggin & Brown (Civ. App.), 90 S. W., 521; St. Louis, S. W. Ry.

Co. v. Jackson & Co. (Civ. App.), 118 S. W., 853; Wilburn v. Wabash Ry. Co., 148 Mo. App., 692, 129 S. W., 484.

*Turney, Burges, Culwell & Pollard,* all of El Paso, for defendant in error, Mallory Steamship Company.

The contract of a carrier by water is from port to port, and its only obligation at delivering port is to give seasonable notice of arrival, place shipment on wharf at convenient or customary place, and when these things have been accomplished its liability growing out of the carriage and handling of the shipment ceases. The Eddy, 72 U. S., 495; Converse v. Norwich & N. Y. Trans. Co., 33 Conn., 166; Aetna Ins. Co. v. Wheeler, 49 N. Y., 616; Richardson v. Goddard, 64 U. S., 28; Pratt v. Grand Trunk Ry. Co., 95 U. S., 43; Morgan v. Dibble, 29 Texas, 108; Texas & Pac. Ry. Co. v. Reiss, 183 U. S., 621.

*Fryer & Cunningham,* of El Paso, for defendant in error, American Grocery Company.

*Fouts, Amerman, Patterson & Moore,* of Houston, as amicus curiae.

MR. JUDGE SHARP of the Commission of Appeals delivered the opinion for the court.

This is a suit by the American Grocery Company and others against the Mallory Steamship Company, Galveston, Harrisburg & San Antonio Railway Company and the Galveston Wharf Company, for the value of a carload of sardines destroyed by fire while the same was in transit to that company as consignee. The shipment originated in Seaport, Maine, the initial carrier being the Seaport Navigation Company, which issued a through bill of lading, shipper's order, notify American Grocery Company, El Paso, Texas. Under the bill of lading this merchandise was routed: Seaport Navigation Company, Mallory Steamship and G. H. & S. A. Railway Company, the Galveston Wharf Company not being a party to the bill of lading.

The case was tried before the court without a jury and the trial court rendered judgment in favor of the American Grocery Company and others against the Galveston Wharf Company for the value of the shipment and in favor of the G., H. & S. A. Railway Company and the Mallory Steamship Company. An appeal was made to the Court of Civil Appeals and the judgment of the trial court was reversed as to the Wharf Company and judgment rendered in favor of the American Grocery Company against the G. H. & S. A. Ry. Co. 13 S. W.

(2d) 983. Writs of error were granted by the Supreme Court to review the judgment of the Court of Civil Appeals.

The case was referred to Section B of the Commission of Appeals and the Commission, through Judge Ryan, in its original opinion reversed the opinion of the Court of Civil Appeals and affirmed the judgment of the trial court. 25 S. W. (2d) 588.

Upon motion for rehearing the Supreme Court withdrew the case from Section B, set aside the judgment rendered therein, and retained same for its decision.

We refer to the opinions of the Court of Civil Appeals and Commission of Appeals for a more detailed statement of the nature of the case.

For convenience the companies involved will be designated as the Steamship Company, the Railway Company and the Wharf Company.

At the very threshold of this case we are met with this question: In whose possession was the shipment of goods at the time of the fire? Let us briefly review the testimony bearing upon this phase of the case. The evidence is undisputed that the shipment arrived at Galveston on the morning of January 13, 1926, in the S. S. "Concho." At Galveston the Steamship Company leased from the Wharf Company certain piers which the Steamship Company used in its freight business. Pier 24 was used as the pier on which the Steamship Company unloaded inbound shipments coming to Galveston. Other piers were used by the Steamship Company for loading outbound shipments.

At the time in question the Railway Company, named in the bill of lading as the delivering carrier, had no tracks which connected with the unloading depot of the Steamship Company at Pier 24. The Wharf Company had tracks which made connection with the railway line at a point removed from Pier 24. The Wharf Company filed tariffs with the Interstate Commerce Commission which fixed a charge for two services to be rendered to the carrier in two respects: (1) The Wharf Company would check with the clerks of the Steamship Company and pick up the shipments from Pier 24 destined to inland points in Texas, truck these shipments to the cars adjacent to Pier 24, load the cars; and (2) switch the cars to the respective rail-carriers named as delivering carriers in the bill of lading.

During the day of January 13, 1926, the Steamship Company unloaded a very large number of shipments from the S. S. "Concho" and placed them on Pier 24. Among these was the shipment to the Grocery Company. During that day the Wharf Company picked up from Pier 24 sixty-six cars of freight which

had been unloaded by the Steamship Company from the S. S. "Concho" and placed these sixty-six cars of merchandise in cars for various railroads, but at seven o'clock on the evening of January 13, 1926, when the Wharf Company closed its operation for the day the shipment involved in this suit with other shipments was still on Pier 24, where it had been placed by the Steamship Company and where it was destroyed by fire on the night. of January 13, 1926.

On the day of the 13th this shipment needed recoopering, because of some damaged packages. This recoopering was completed somewhere around 4 o'clock in the afternoon of the 13th day of January, 1926. The unloading began at 8:30 A. M. on said date and was completed by the Mallory Line at about 5:30 P. M. of the same day.

Some of the witnesses for the Steamship Company testified, in effect, that so far as the Steamship Line was concerned, it had completed the delivery of the shipment. Witnesses for the Wharf Company testified, in substance, that the Steamship Company unloaded the shipment on the pier and it was taken possession of by the Wharf Company when the shipments are lifted from the floor of the pier and deposited in the cars by the Wharf Company forces for account of the Galveston Bay Lines. That the local freight is held on the pier and delivery is made to the consignees by the Steamship Company forces from these piers. That is the only place where it transacts the business of receiving freight and discharging freight on the piers rented from the Wharf Company.

Mr. Gossreau, General Manager of the Wharf Company, testified:

"There is no receipt given for any freight handled for the Mallory Line until such a service has been actually performed."

Again he says:

"Our forces are at liberty to begin the loading as soon as the freight is put on the wharf but the practice is to wait until there is a sufficient amount deposited there to keep the labor busy. Otherwise it is not a paying investment. It is our privilege to begin loading as soon as it is put on the wharf, unless a hold order is put on some specific shipment, which happens only occasionally. So that as soon as freights were deposited on the wharf by the forces of the Mallory there was nothing to prevent our forces from immediately picking it up and trucking it to the cars. That was all left to the judgment and discretion of the Galveston Wharf Company Supervisor of forces on

the docks. It was not a matter within the control of the Mallory Line."

He further says:

"The Mallory Line never has required so far as that boat is concerned for us to give them a receipt for what we picked up before we loaded it."

Again he says:

"It gets its receipts the following day or as soon thereafter as possible. In the meantime the freights are absolutely gone so far as the Mallory is concerned and I think they depend upon the well known integrity of the Wharf Company to see that the receipts are forth coming. It is just a matter of confidence but in the meantime the possession of the stuff is away from them and out of them. It has left their possession."

More testimony along this line could be quoted but we think the above sufficient to illustrate our views. The trial court in its findings of fact, among other things, found:

(1) That the shipment in question was in the exclusive possession of the Wharf Company; and

(2) That it was not in possession of either the Railway Company or the Steamship Company.

■ The Wharf Company contends that it should be held under the evidence introduced that, as a matter of law, no delivery of the shipment in controversy was made by the Steamship Company to the Wharf Company. To this contention we cannot agree. We think the evidence raises a fact issue to be determined and the trial court found that a delivery had been made by the Steamship Company to the Wharf Company.

Under the state of the record, we do not think it can be said, as a matter of law, that there was no evidence of any probative force to sustain the findings of the trial court. It can only become a question of law when the facts and circumstances are such that but one reasonable conclusion can be drawn therefrom. Wininger v. Ft. Worth & D. C. Ry. Co., 105 Texas, 56, 143 S. W., 1150; Radley v. Knepfly, 104 Texas, 130; Cartwright v. Canode, 106 Texas, 507, 171 S. W., 696.

■ This brings us to the consideration of another question: Was the Wharf Company a common carrier as defined by law and liable for the shipment destroyed by fire?

It is the contention of the Wharf Company that the service performed by it is such that it does not come under the definition of a common carrier; that it was not mentioned in the through bill of lading and by reason of the nature of its services

and compensation paid therefor, it is merely an agent of the railroad lines.

The trial court found:

"That the Galveston Wharf Company is a chartered transportation Company, owning, in addition to the piers located on the Galveston Bay side of the island, about fifty-one (51) miles of railroad trackage, extending from said piers along and through its yards in Galveston to connections with the lines of railroad operating out of Galveston, including the Galveston, Harrisburg & San Antonio Railway Company. That said Galveston Wharf Company owns and operates eight (8) switch engines, providing therefor the necessary yard and engine forces.

"That it had on file with the Interstate Commerce Commission and with the Texas Railroad Commission, duly promulgated tariffs covering its charges for the various services performed and to be performed by it. That it makes the regular reports to the Interstate Commerce Commission that are ordinarily made and required of all common carriers by railroads. That it has a general manager superintendent of terminals, treasurer and the usual other officers as required and necessary in the conduct of that character of business.

"That its railroad tracks extend to and along the Pier 24, where the shipment in question had been unloaded from the steamship."

Mr. Gossreau testified as follows:

"I think the Galveston Wharf Company is recognized as a common carrier. I believe it has been declared so by the Interstate Commerce Commission."

We think the finding of the trial court finds ample support in the evidence as shown by the record.

That the Wharf Company is a common carrier as defined by the Acts of Congress of the United States, the statutes of this state and by both federal and state decisions is fully settled. Interstate Com. Act, Title 49, U. S. C. A., sec. 1, par. 3; sec. 6, par. 13; Art. 10, sec. 2, Constitution of Texas; Art. 1491, R. S., 1925; Art. 905, R. S., 1925; Washington et al. v. Kuykendall, 275 U. S., 207, 72 L. ed., 241; United States v. Union Stock Yard Co., 226 U. S., 286, 57 L. ed., 226; Batchelder & Snyder Co. v. Union Freight R. Co., 259 Mass., 368, 54 A. L. R., 616; Petition for writ of certiorari denied by U. S. Sup. Ct., Nov. 21, 1927, 275 U. S., 556, 72 L. ed., 424, 48 Sup. Ct. Rep., 117; Missouri, K. & T. Ry. Co. v. Ward, 244 U. S., 383, 61 L. ed., 1213; Union Stock Yards Co. v. United States, 169 Fed.,

404; United States v. Northern Pacific Terminal Co., 181 Fed., 879; Ft. Worth Belt Ry. Co. v. United States, 22 Fed. (2d) 795; Tap Line Cases, 234 U. S., 1, 58 L. ed., 1185; United States v. Ramsey, 197 Fed., 144; Southern Pacific Term. Co. v. Interstate Com. Com., 219 U. S., 498, 55 L. ed., 310; Kansas City S. Ry. Co. v. Rosebrook-Josey Grain Co., 114 S. W. (Civ. App.) 436; Gulf, C. & S. F. Ry. Co. v. Hines, 4 S. W. (2d) (Civ. App.) 641; Missouri Pac. Ry. Co. v. Wichita Groc. Co., 55 Kan., 525, 40 Pac., 899; People et al. v. Public Service Co., 191 N. Y. S., 636, 198 App. Div., 436, affirmed 134 N. E., 590, and certiorari denied by U. S. Sup. Ct., 42 S. Ct., 314, 258 U. S., 621, 66 L. ed., 795; Nation v. San Antonio S. Ry. Co., 115 Texas, 431, 283 S. W., 157; Burd v. San Antonio S. Ry. Co., 261 S. W., 1021.

Many other cases could be cited.

In the case of United States v. Union Stock Yard & Transit Company, 226 U. S., 286, 57 Law Ed., 226, it was contended there, as here, that by reason of the peculiar service rendered by the Union Stock Yard & Transit Company that it was not a common carrier and controlled by the provisions of the Interstate Commerce Act. In passing upon this question, the Supreme Court of the United States said:

"Together, these companies, as to freight which is being carried in interstate commerce, engage in transportation within the meaning of the act, and perform services as a railroad when they take the freight delivered at the stock yards, load it upon cars, and transport it for a substantial distance upon its journey in interstate commerce under a through rate and bill furnished by the trunk line carrier, or receive it while it is still in progress in interstate commerce upon a through rate which includes the terminal services rendered by the two companies, and complete its delivery to the consignee. They are common carriers because they are made such by the terms of their charters, hold themselves out as such, and constantly act in that capacity, and because they are so treated by the great railroad systems which use them. In Union Stock Yards Co. v. United States, 94 C. C. A., 626, 169 Fed., 404, Mr. Justice Van Devanter (while a circuit judge), speaking for the court of appeals said:

" 'Its (the Stock Yards Company's) operations * * * include the maintenance and use of railroad tracks and locomotives, the employment of a corps of operatives in that connection, and the carriage for hire over its tracks of all live stock destined to or from the sheds or pens, which, in effect, are the depot of the railroad companies for the delivery and receipt of shipments of live stock at South Omaha. The carriage of these shipments

from the transfer track to the sheds or pens, and vice versa, is no less a part of their transit between their points of origin and destination than is their carriage over any other portion of the route. True, there is a temporary stoppage of the loaded cars at the transfer track, but that is merely incidental, and does not break the continuity of the transit any more than does the usual transfer of such cars from one carrier to another at a connecting point. And it is of little significance that the stock yards company does not hold itself out as ready or willing generally to carry live stock for the public, for all the railroad companies at South Omaha do so hold themselves out, and it stands ready and willing to conduct, and actually does conduct, for hire, a part of the transportation of every live stock shipment which they accept for carriage to or from that point, including such shipments as are interstate.' "

Article 10, Section 2 of the Constitution of the State of Texas, provides that—

"Railroads heretofore constructed or which may hereafter be constructed in this State are hereby declared to be highways, and railroad companies, common carriers."

■ We are referred to the case of Texas & P. Ry. Co. v. Henson, 103 Texas, 598, 132 S. W., 118, and other decisions as controlling in this case. It must be kept in mind that this is a federal question and a determination thereof must be governed by federal decisions. In that case Chief Justice Gaines did not directly pass upon the question as to whether or not the Ft. Worth Belt Railway Company was a common carrier. Recently in the case of Ft. Worth Belt Ry. Co. v. United States, 22 Fed. Rep. (2d) page 795, the Circuit Court of Appeals passed directly upon the question and held that the Ft. Worth Belt Railway Company was a common carrier under the provisions of the Safety Appliance Act, as follows:

"By section 1 of the Act of March 2, 1903, the provisions of the Safety Appliance Act were so extended as to apply to 'all * * * cars * * * used on any railroad engaged in interstate commerce.' As the defendant uses its tracks to haul over them interstate shipments to and from their destination, it cannot plausibly be questioned that the defendant's lines constitute a 'railroad engaged in interstate commerce.' In behalf of the defendant it was contended that the prescribed penalty was not incurred by the movement in question, because no interstate traffic was involved in that movement. This contention is not sustainable, as it has been settled by authoritative decisions that the penalty is incurred by moving on a railroad engaged

in interstate commerce a car defectively equipped as the one in question, though at the time of such movement that car and others in connection with which it is moved are engaged exclusively in intrastate commerce. Southern Ry. Co. v. United States, 222 U. S., 20, 32 S. Ct., 2, 56 L. ed., 72; Southern Ry. Co. v. Railroad Commission of Indiana, 236 U. S., 439, 35 S. Ct., 304, 59 L. ed., 661."

It is earnestly contended, and the Court of Civil Appeals held, that the Wharf Company was merely an agent of the Railway Company and, therefore, was not liable for the value of the shipment and the loss should be paid by the Railway Company. Let us briefly review the facts upon this issue:

Mr. Gossreau, General Manager for the Wharf Company, testified:

"At the time the fire occurred on January 13th the Galveston Wharf Company absolutely had done nothing to take possession of the shipment of sardines. They had not handled it in any way. At the time of the fire they had not begun to start the service they were going to be paid for by the G. H. & S. A."

The tariffs introduced show wharf tariffs chargeable to the Steamship Company and loading and switching charges chargeable to the railroad carrier. Mr. Gossreau further testified:

"Outside of the $5,000 a year the Mallory Steamship Company pays us for the rental of Pier No. 24 and others. We receive compensation for one service from the Bay Lines, and we receive compensation for another service from the Mallory. When the boat comes in, the Mallory, in addition to the rental, in accordance with Local Tariff No. 18, under Section 3, would be assessed as follows: 'Rates and rules governing the handling of traffic over the wharves and piers of the Galveston Wharf Company,' wharfage rates in cents per hundred pounds, except as otherwise provided, applying on import and coastwise traffic inward."

He further testified:

"As to the understanding at the time of this fire as to when the Galveston Wharf Company took possession, the general understanding was that the shipments are taken possession of when they are lifted from the floor of the pier and deposited in the cars by the Galveston Wharf Company's forces for account of the Galveston Bay Lines."

He further testified:

"The local freight is held on the pier and delivery is made to the consignees by the Mallory Line's forces from these same piers. That is the only place where they transact their business

of receiving freight and discharging freight, on these piers that they rent from us."

He further testified:

"At the time this fire occurred on January 13, 1926, the Mallory Line was exclusively using Pier No. 24."

He further testified:

"It contains also wharfage charges covering freight passing over piers, which charge is assessed against the vessel or its owners."

Albert J. Schulte, Chief Dock Clerk and witness for the Steamship Company, testified that—

"It is a fact that the Wharf Company's clerks enter a record of these shipments in that billing on the books, just like the Mallory Line. As to whether, after they do that on carload lots, whenever the Galveston Wharf Company gets ready to pick up a carload lot at Pier No. 24, and put it on a car, they take a copy of the billing, accompanied by a clerk of the Mallory, and check those carload lots as they pick them up and take them up and take them over to the car."

The Steamship Company claimed the right, under proper orders, to divert the shipment at any time prior to the actual loading by the Wharf Company into the cars of the Railway Company.

Mr. Bertram, a witness for the Steamship Company, stated that—

"If we had been confronted with a diversion or reconsignment of that shipment of sardines to some dealer in Greenville, Texas, if the American Grocery Company had filed a diversion or reconsignment, we would have endeavored to have a diversion. We would have reconsigned it for the accommodation of the consignee. After the goods had actually been loaded in the freight cars, and we had received the diversion or reconsignment order, the shipment would have been beyond our control."

The contract between the Wharf Company and the Steamship Company leasing to the latter the pier in question, provided that such pier would be leased by it and the evidence shows that on the night in question, at the time of the fire, this shipment of goods was being policed by the Steamship Company. It is undisputed that no part of the shipment had been loaded on the cars of the Railway Company.

Another cogent reason why the shipment of goods had not been delivered to the Railway Company is reflected in the fact, as shown by the uncontroverted evidence, that after the fire

whatever remained of the cargo was salvaged by the Steamship Company.

■ The trial court further found that the goods had not been delivered to the Railway Company at the time of the fire. This finding, in our judgment, is fully sustained by the evidence.

The Court of Civil Appeals reversed that part of the judgment rendered by the trial court in favor of the American Grocery Company and others against the Wharf Company and rendered judgment in favor of the American Grocery Company and others against the Railway Company upon the theory that the Wharf Company was the agent of the Railway Company.

If the Court of Civil Appeals undertook to substitute its findings of fact for the findings of fact made by the trial court and render final judgment thereon, it would not be authorized to do so, if there was any evidence in the record to sustain the finding made by the trial court. Patrick v. Smith, 90 Texas, 267, 38 S. W., 17; Houston & T. C. Ry. Co. v. Strycharski, 92 Texas, 1, 37 S. W., 415; Choate v. San Antonio Ry. Co., 91 Texas, 406, 44 S. W., 69.

However, as we construe the opinion of the Court of Civil Appeals, that court does not undertake to substitute its findings of facts for the findings of the trial court, but merely construed the legal effect of the evidence, considered as a whole, and held, as a matter of law, that the Wharf Company was the agent of the Railway Company and not liable for the shipment of goods destroyed by fire and, therefore reversed and rendered the cause. This ruling gives the Supreme Court the power to review the evidence. Marshburn v. Stewart, 113 Texas, 518, 260 S. W., 565; Tweed v. Western Union Tel. Co., 107 Texas, 247; Beck v. Texas Co., 105 Texas, 303.

The case of Missouri Pacific Railroad Company v. Reynolds-Davis Grocery Company, 268 U. S., 366, 69 L. Ed., 1000, is cited as controlling in this case. That case was an action brought by Reynolds-Davis Grocery Company against the Missouri Pacific Railroad Company to recover for the loss of part of a carload of sugar shipped from Raceland, Louisiana, to Fort Smith, Arkansas, on a through bill of lading. The loss occurred within the city of Fort Smith while the car was in the possession of the St. Louis-San Francisco Railroad.

The joint through rate covered delivery at the warehouse of the consignee. The bill of lading named Morgan's Louisiana & Texas Railroad & Steamship Company as the initial carrier, and the Missouri Pacific as the last of the connecting carriers.

14

Its lines enter Fort Smith, but do not extend to the consignee's warehouse. It employed the St. Louis-San Francisco to perform the necessary switching service and paid it for such service. Under these facts, the Supreme Court of the United States held that the St. Louis-San Francisco Railroad was merely the agent of the Missouri Pacific.

The Supreme Court of Arkansas in its opinion rendered in the foregoing case, 161 Ark., 579, 257 S. W., 70, states the facts more fully as follows:

"The bill of lading evidencing the special contract under which the shipment in controversy was made, shows that the appellant was the last connecting carrier operating under that bill of lading. This was a through bill of lading from the non-agency station at Mathews, La., to Ft. Smith, Ark., in which the appellant undertook to make the delivery to the consignee at Ft. Smith. The Frisco Railroad Company was not named in this bill of lading as a connecting carrier, and the services it performed in the premises under its switching arrangements with the appellant were not as a connecting carrier, but purely and simply at the instance, and as the agent, of appellant. The terms of the bill of lading control here. Under those terms the appellant is undoubtedly the terminal carrier, and bound itself under the terms of the contract to make the delivery, and it cannot shift its liability upon the shoulders of some other carrier or agency which was not in the contemplation of the parties to the contract."

What are the facts of this case? It is undisputed that the Steamship Company has leased certain piers from the Wharf Company for the purpose of unloading its freight; that the Wharf Company handled its cargoes and loaded it on the cars of the various railroad lines and then switched them from the Wharf Company to the Railroad line receiving same. The testimony shows that if the Steamship Company should desire to divert the shipment before delivered to the railroad that it is authorized to do so. The trial court held that the delivery had not been made to the railroad and the testimony shows that it had not issued a receipt therefor. It is also shown that no part of this shipment had been loaded on the cars of the railroad. The General Manager for the Wharf Company testified that at the time of the fire it had done nothing to take possession of the shipment of sardines. At the time of the fire they had not begun to start the services they were going to be paid for by the railroad and he further testified that the general understanding was that the shipments are taken possession of when

they are lifted from the floor of the pier and deposited in the cars by the Wharf Company's forces for account of the Galveston Bay Lines.

In the case of Missouri, K. & T. R. Co. v. Ward, 244 U. S., 383, 61 Law Ed., 1213, the Supreme Court of the United States held that—

"The purpose of the Carmack Amendment has been frequently considered by this court. It was to create in the initial carrier unity of responsibility for the transportation to destination. Atlantic Coast Line R. Co. v. Riverside Mills, 219 U. S., 186, 55 L. ed., 167, 31 L. R. A. (N. S.) 7, 31 Sup. Ct. Rep., 164; Northern P. R. Co. v. Wall, 241 U. S., 87, 92, 60 L. ed., 905, 907, 36 Sup. Ct., 493. And provisions in the bill of lading inconsistent with that liability are void. Norfolk & W. R. Co. v. Dixie Tobacco Co., 228 U. S., 593, 57 L. ed., 980, 33 Sup. Ct. Rep., 609. While the receiving carrier is thus responsible for the whole carriage, each connecting road may still be sued for damages occurring on its line; and the liability of such participating carrier is fixed by the applicable valid terms of the original bill of lading. The bill of lading required to be issued by the initial carrier upon an interstate shipment governs the entire transportation."

The court in the same case further held as follows:

"For the purpose of fixing the liability, the several carriers must be treated, not as independent contracting parties, but as one system; and the connecting lines become in effect mere agents, whose duty it is to forward the goods under the terms of the contract made by their principal, the initial carrier. Atlantic Coast Line R. Co. v. Riverside Mills, 219 U. S., 186, 206, 55 L. ed., 167, 182, 31 L. R. A. (N. S.) 7, 31 Sup. Ct. Rep., 164; Galveston, H. & S. A. R. Co. v. Wallace, 223 U. S., 481, 491, 56 L. ed., 516, 523, 32 Sup. Ct. Rep., 205."

See Texas & P. Ry. Co. v. Leatherwood, 250 U. S., 478, 63 L. ed., 1096; Burd v. San Antonio S. Ry. Co., 115 Texas, 431, 261 S. W., 1021.

The case of Batchelder & Snyder Co. v. Union Freight R. Co., 259 Mass., 368, 156 N. E., 698, 54 A. L. R., 616, involved the liability of a company engaged in delivering cars between freight terminals and private sidings and it was contended there, as here, that the company engaged in such switching services was not a common carrier. In that case Batchelder & Snyder Co. sued the Union Freight Railroad Company for damages to a shipment which was delivered to the defendant by one of the carriers and while in possession of the defendant,

Union Freight Railroad Company, the goods became injured or damaged and to recover the value thereof plaintiffs sued that company. This shipment consisted of a carload of pickled hams shipped by Hately Brothers Company from Chicago on a uniform order bill of lading, consigned to "Hatley Brothers Company, Boston, notify Batchelder & Snyder Company, Boston," routed by New York Central and Boston & Albany railroads. The Union Freight Railroad Company was not mentioned in the through bill of lading. When the shipment reached Boston the Boston and Albany Railroad placed the car in possession of the defendant for delivery to the consignee. As stated, while in the possession of the defendant the alleged injury to the shipment occurred. The trial court held that the interstate transit ended with the acceptance of the car by the defendant on May 13th; that no contract between these parties existed upon the bill of lading and therefore denied plaintiff a recovery against the defendant. The Massachusetts Supreme Judicial Court in passing upon this question held:

"The defendant is a common carrier. See Union Freight R. Co. v. Winkley, 159 Mass., 133, 38 Am. St. Rep., 398, 34 N. E., 91; United States v. Union Stock Yard & Transit Co., 226 U. S., 286, 57 L. ed., 226, 33 Sup. Ct. Rep., 83. It received the car for transit on its line in Boston from the yards of the Boston & Albany Railroad to the plaintiff's unloading platform at Constitution Wharf. Transit began when the car was received, and ended when it was 'set' at the specified place of delivery. Rice v. Hart, 118 Mass., 201, 19 Am. Rep., 433, and cases cited. New York, N. H. & H. R. Co. v. Porter, 220 Mass., 547, 108 N. E., 499. There was no intermediate point when and where the car was unloaded or when and where it was accessible to the plaintiff for any purpose. The defendant occupied throughout this period the position of a common carrier in control of the car and its contents. South Deerfield Onion Storage Co. v. New York, N. H. & H. R. Co., 222 Mass., 535, 111 N. E., 367; P. Garvan v. New York, C. & H. R. Co., 210 Mass., 275, 96 N. E., 717; Michigan C. R. Co. v. Mark Owen & Co., 256 U. S., 427, 65 L. ed., 1032, 41 Sup. Ct. Rep., 554; McNeill v. Southern R. Co., 202 U. S., 543, 50 L. ed., 1142, 26 Sup. Ct. Rep., 722. It was, therefore, an insurer, Norway Plains Co. v. Boston & M. R. Co., 1 Gray, 263, 61 Am. Dec. 423; Chicago & N. W. R. Co. v. C. C. Whitnack Produce Co., 258 U. S., 369, 372, 66 L. ed., 665, 667, 42 Sup. St. Rep., 328, and cases cited."

■ The underlying principle of the Carmack Amendment and the amendments thereto is one of agency. When the initial car-

rier accepts goods for shipment it is treated as a through contract and all connecting carriers are agents of the initial carrier, and it is their duty to forward shipments under the terms of the contract made by the initial carrier. Each connecting carrier is the agent of all of the others. For the purpose of fixing liability the several carriers are treated not as independent contracting parties, but as one system. It is well settled that each connecting carrier is responsible for loss or injury inflicted during the transportation while the property is on its particular line. This statute gives the shipper any remedy he may have under the common law as recognized by the federal courts. He is not confined either to the initial carrier or to the connecting carriers for his satisfaction and he may join all the carriers in one suit for damages. Furthermore, he is not required to elect which one he will hold liable. In the suit of Missouri Pacific Railroad v. Reynolds-Davis Grocery Company, supra, the plaintiffs sued the Missouri Pacific Railroad, the terminal carrier, for the damages sustained. This the law gave them the right to do. In this case plaintiffs sued the Steamship Company as well as the Wharf Company as connecting carriers and the Railway Company as the delivering carrier. Under the law plaintiff could sue all of them, as was done in this case, and the trial court could render judgment against the carrier liable for the loss or damages to the shipment of goods.

In the face of this record and the foregoing authorities, it would be illogical to hold that the Wharf Company was merely the agent of the Railway Company and, therefore, not liable for the value of the shipment of goods destroyed by fire while in its possession. Logically it follows that the Wharf Company would be liable for the value of the shipment destroyed by fire.

The judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

The foregoing opinion is adopted as the opinion of the Supreme Court, and judgment will be entered in accordance therewith.

C. M. CURETON, Chief Justice.